**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**
**Bangor Division**

| | | |
|---|---|---|
| CALVARY CHAPEL OF BANGOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| JANET MILLS, in her | ) | |
| official capacity as Governor of the | ) | |
| State of Maine, | ) | |
| | ) | |
| Defendant. | ) | |

**VERIFIED COMPLAINT FOR DECLARATORY RELIEF,**
**TEMPORARY RESTRAINING ORDER, PRELIMINARY AND**
**PERMANENT INJUNCTIVE RELIEF, AND DAMAGES**

For its Verified Complaint against Defendant, JANET MILLS, in her official capacity as Governor of the State of Maine ("Governor Mills" or the "State"), Plaintiff, CALVARY CHAPEL OF BANGOR ("Calvary Chapel"), alleges and avers as follows:

**URGENCIES JUSTIFYING TEMPORARY RESTRAINING ORDER**

1. In its Prayer for Relief, *infra*, and in the contemporaneously filed Motion for Temporary Restraining Order (TRO), Calvary Chapel seeks a TRO restraining enforcement against Calvary Chapel of the various COVID-19 orders issued by Governor Mills and other State officials purporting to prohibit Calvary Chapel, on pain of criminal sanctions, from gathering in-person at Calvary Chapel for worship services, regardless of the number of individuals present or whether Calvary Chapel meets or exceeds the social distancing and hygiene guidelines pursuant to which the State disparately and discriminatorily allows so-called "essential" commercial and non-religious entities (*e.g.*, liquor stores, marijuana dispensaries, warehouse clubs, and 'big box' stores) to accommodate large crowds and masses of persons without scrutiny or numerical limit.

2.      As shown in the verified allegations below, Governor Mills' Executive Orders relating to COVID-19 have been interpreted, applied, and enforced, including against the pastor of Calvary Chapel, such that Pastor Ken Graves ("Pastor Graves") has been forced not to hold in-person religious services at the Church and to prohibit his members from attending their house of worship.

3.      At around the same time as Governor Mills' Executive Orders surrounding COVID-19 were being used to threaten criminal sanctions on Calvary Chapel's pastor, officials in other jurisdictions had similarly threatened to impose criminal sanctions on other religious gatherings. In Louisville, Kentucky, for example, the government threatened to use police to impose criminal sanctions on those individuals found in violation of similar COVID-19 orders and threatened to impose various sanctions on individuals found in violation of such orders. The United States District Court for the Western District of Kentucky found that the mere threat of such criminal sanction warranted a TRO. *See On Fire Christian Center, Inc. v. Fischer*, No. 3:20-cv-264-JRW, 2020 WL 1820249 (W.D. Ky. Apr. 11, 2020) [hereinafter *On Fire*]. The *On Fire* TRO enjoined the Mayor of Louisville from "**enforcing, attempting to enforce, threatening to enforce, or otherwise requiring compliance with any prohibition on drive-in church services at On Fire**." *Id.* at *1 (emphasis added).

4.      In fact, the Maine State Police—acting under the direction of Governor Mills' orders—have publicly declared that they would enforce the Governor's orders and have threatened to impose criminal sanctions on those found in violation of them.

5.      Additionally, the Governor of Kansas had imposed a similar restriction on religious gatherings in Kansas, stating that "gatherings" of more than 10 individuals are prohibited, including religious gatherings. On April 18, 2020, the United States District for the District of Kansas issued a TRO enjoining Kansas officials from enforcing its discriminatory prohibition on

religious gatherings and required the government to treat "religious" worship services the same as other similar gatherings that are permitted. *See First Baptist Church. v. Kelly*, No. 20-1102-JWB, 2020 WL 1910021, *6–7 (D. Kan. Apr. 18, 2020) [hereinafter *First Baptist*]. The *First Baptist* TRO specifically stated that the government's disparate treatment of religious gatherings was a violation of the Free Exercise Clause because it showed that "**religious activities were specifically targeted for more onerous restrictions than comparable secular activities**," and that the churches had shown irreparable harm because they would "be prevented from gathering for worship at their churches" during the pendency of the executive order. *Id.* at *7–8 (emphasis added).

6.      In discussing the Kansas orders—which imposed a 10-person limit on in-person gatherings, which is onerous but still not as restrictive as Governor Mills' orders—the court said that specifically singling out religious gatherings for disparate treatment while permitting other non-religious activities "show[s] that these executive orders expressly target religious gatherings on a broad scale and are, therefore, not facially neutral," *First Baptist*, 2020 WL 1910021, at *7, and—much like here—"churches and religious activities appear to have been singled out among essential functions for stricter treatment. **It appears to be the only essential function whose core purpose—association for the purpose of worship—had been basically eliminated**." *Id.* (emphasis added). Thus, the court found that a TRO was necessary and that Kansas should be enjoined from enforcing its orders' disparate terms against churches. Indeed, "**it goes without saying that the government could not lawfully expressly prohibit individuals from meeting together for religious services**." *Id.* at *6 (emphasis added).

7.      Additionally, the Sixth Circuit of Appeals has issued an Emergency Injunction Pending Appeal prohibiting the Governor from enforcing prohibitions on religious worship services. *See Maryville Baptist Church, Inc. v. Beshear*, -- F.3d --, No. 20-5427, 2020 WL 2111316

(6th Cir. May 2, 2020). In that appeal challenging orders similar to Governor Mills' orders here, the Sixth Circuit stated that "[t]he Governor's actions substantially burden the congregants' sincerely held religious practices—**and plainly so**. . . . **Orders prohibiting religious gatherings, enforced by police officers telling congregants they violated a criminal law and by officers taking down license plate numbers, amount to a significant burden on worship gatherings**." 2020 WL 2111316, at *2 (emphasis added). Additionally, "[t]he way the orders treat comparable religious and non-religious activities suggests that they do not amount to the least restrictive way of regulating the churches." *Id.* "Outright bans on religious activity alone obviously count. So do general bans that cover religious activity when there are exceptions for comparable secular activities." *Id.*, at *3. In discussing the prohibitions on religious gatherings, the Sixth Circuit posed several questions of equal import here:

> Assuming all of the same precautions are taken, why is it safe to wait in a car for a liquor store to open but dangerous to wait in a car to hear morning prayers? **Why can someone safely walk down a grocery store aisle but not a pew?** And why can someone safely interact with a brave deliverywoman but not with a stoic minister? **The Commonwealth has no good answers. While the law may take periodic naps during a pandemic, we will not let it sleep through one.**

*Id.*, at *4 (emphasis added).

8.     Because the prohibition on religious gatherings substantially burdened Maryville Baptist's sincerely held religious beliefs and was not the least restrictive means, the Sixth Circuit concluded the plaintiff church and pastor were likely to succeed on the merits of their free exercise claims as to both in-person and drive-in services. *Id.*, at *2–3. Balancing the remaining injunction factors, the court issued an injunction pending appeal enjoining the Governor of Kentucky from enforcing his unconstitutional orders against drive-in services, and directed the district court to prioritize consideration of enjoining in-person services, with the admonition, "The breadth of the ban on religious services, together with a haven for numerous secular exceptions, should give pause to anyone who prizes religious freedom." *Id.*, at *5.

4

9.     Calvary Chapel's members were also threatened with criminal sanctions and penalties if, at any time, any number of individuals gathered together for in-person worship services at Calvary Chapel, and regardless of whether social distancing, enhanced sanitization, and personal hygiene practices were followed. Because of the government threat of criminal sanction, Calvary Chapel was forced not to host services on Easter Sunday, the most treasured day in Christianity.

10.     Absent emergency relief from this Court, Calvary Chapel, its pastor, and all congregants will suffer immediate and irreparable injury from the threat of criminal prosecution for the mere act of engaging in the free exercise of religion and going to church. **Indeed, if Calvary Chapel, its pastor, or its congregants do not subscribe to what Governor Mills' has prescribed as orthodox in a worship service, they risk becoming criminals in the State.** A temporary restraining should issue.

## INTRODUCTION

11.     Due to the unprecedented nature of the 2019 novel coronavirus disease (COVID-19) and the indisputable health tragedy the disease has wrought on our great Republic and those victims suffering under its yoke, there are those who may find it "tempting to hold that First Amendment rights should acquiesce to national security in this instance." *Tobey v. Jones*, 706 F.3d 379, 393 (4th Cir. 2013). One could be forgiven for hastily reaching such a conclusion in such uncertain times, but "our Forefather Benjamin Franklin warned against such a temptation by opining that those who can give up essential liberty to obtain a little temporary safety, deserve neither liberty nor safety." *Id.*

12.     When the great American experiment was first implemented, our revered Founders took pains to note that the Constitution—and all of the rights it recognized and enshrined—was instituted "in order to form a more perfect Union, establish Justice, insure domestic Tranquility,

provide for the common defense, promote the general Welfare, and **secure the Blessings of Liberty to ourselves and our Posterity**." U.S. Const. Pmbl. (emphasis added). To this very day, "we continue to strive toward '[that] more perfect union.'" *Smith v. City of New Smyrna Beach*, No. 6:110cv01110-Orl-37KRS, 2013 WL 5230659, *1 (M.D. Fla. Sept. 16, 2013). That work is not easy, and governments acting in good faith can and sometimes do miss the mark. This is such a case.

13.     Recognizing that times of crisis would arise, that such times might lead governments to seek to repress precious freedoms, and that the Republic's survival depended upon defeating such repressive instincts, the genius of our founding document is that it placed explicit protections into the text of the Bill of Rights. And, importantly, "[o]ur Bill of Rights placed our survival on firmer ground—that of freedom, not repression." *Konigsberg v. State Bar of California*, 366 U.S. 36, 79 (1961) (Black, J., dissenting).

14.     During times of national crisis, such as the current uncertainty arising from COVID-19, "the fog of public excitement obscures the ancient landmarks set up in our Bill of Rights." *American Communist Ass'n, C.I.O. v. Douds*, 339 U.S. 382, 453 (1950) (Black, J., dissenting). But, where the fog of public excitement is at its apex, "the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly." *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937). Without doubt, "[t]herein lies the security of the Republic, the very foundation of constitutional government." *Id.*

15.     It is beyond cavil that our commitment to our founding principles is most tested and best calculated during times of crisis and uncertainty. Indeed, "[t]imes of crisis take the truest measure of our commitment to constitutional values. **Constitutional values are only as strong as our willingness to reaffirm them when they seem most costly to bear**." *Hartness v. Bush*, 919 F.2d 170, 181 (D.C. Cir. 1990) (Edwards, J., dissenting) (emphasis added). Our willingness to

reaffirm our staunch commitment to our fundamental freedoms is imperative to the very survival of the American experiment. For, "[h]istory reveals that the initial steps in the erosion of individual rights are usually excused on the basis of an 'emergency' or threat to the public. **But the ultimate strength of our constitutional guarantees lies in the unhesitating application in times of crisis and tranquility alike**." *United States v. Bell*, 464 F.2d 667, 676 (2d Cir. 1972) (Mansfield, J., concurring) (emphasis added).

16.     Calvary Chapel brings this case to restrain the troubling transgression of its fundamental and cherished liberties wrought by the imposition of Governor Mills' orders surrounding COVID-19. Calvary Chapel seeks not to discredit or discard the government's unquestionable interest in doing that task for which it was instituted—protecting the citizenry. But, as is often true in times of crisis, Calvary Chapel respectfully submits that in an effort to uphold her sworn duties Governor Mills has stepped over a line the Constitution does not permit. Because of that, Calvary Chapel brings this action to ensure that this Court safeguards the cherished liberties for which so many have fought and died. For, "**[i]f the provisions of the Constitution be not upheld when they pinch as well as when they comfort, they may as well be discarded**." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 483 (1934) (Sutherland, J., dissenting) (emphasis added). Calvary Chapel prays unto the Court that it not permit the cherished and fundamental liberties enshrined in the Constitution to be another tragic casualty of COVID-19.

## PARTIES

17.     Plaintiff, CALVARY CHAPEL OF BANGOR ("Calvary Chapel" or the "Church"), is a non-profit corporation incorporated under the laws of the State of Maine with its principal place of business at 154 River Road Orrington, Maine 04474.

18.     Defendant, JANET MILLS, in her official capacity as Governor of the State of Maine ("Governor Mills" or the "State"), is responsible for enacting and enforcing the COVID-19

Executive Orders and other Orders at issue in this litigation. Governor Mills is sued in her official capacity.

## JURISDICTION AND VENUE

19.    This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought pursuant to 42 U.S.C. § 1983. This action also arises under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §2000cc, *et seq.* This action also arises under Article I, Sections 3, 4, and 13 the Constitution of Maine.

20.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Calvary Chapel's claims occurred in this district.

22.    This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, implemented through Rule 57 of the Federal Rules of Civil Procedure, and is authorized to grant a temporary restraining order and injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

23.    This Court is authorized to grant Calvary Chapel's prayer for relief regarding costs, including a reasonable attorney's fee, pursuant to 42 U.S.C. § 1988.

## GENERAL ALLEGATIONS

**A.    GOVERNOR MILLS' EXECUTIVE ORDERS AND RELATED ORDERS FROM THE STATE OF MAINE.**

24.    On March 15, 2020, in response to COVID-19, Governor Mills issued Proclamation of State of Civil Emergency to Further Protect Public Health, which declared a state of emergency

in the State of Maine. A true and correct copy of the March 15th Emergency Proclamation is attached hereto as **EXHIBIT A** and incorporated herein.

25.     In the Emergency Proclamation, Governor Mills stated that COVID-19 "poses an imminent threat of substantial harm to our citizens" and directed various government agencies to implement certain restrictions and orders to facilitate the State's response.

26.     On March 18, 2020, Governor Mills issued Executive Order 14 stating that "[g]atherings of more than 10 people are prohibited throughout the State," and declared that such a prohibition was primarily aimed at "social, personal, and discretionary events," including those gatherings that are "faith-based." A true and correct copy of Executive Order 14 is attached hereto as **EXHIBIT B** and incorporated herein.

27.     On March 24, 2020, Governor Mills issued Executive Order 19, which continued to prohibit all gatherings of more than 10 people. A true and correct copy of Executive Order 19 is attached hereto as **EXHIBIT C** and incorporated herein.

28.     Though continuing the prohibition on "faith-based" gatherings (*i.e.*, church) of more than 10 people, Governor Mills carved out a massive exemption from such prohibitions for businesses deemed "essential" and for certain businesses deemed "non-essential." Such "essential businesses include *inter alia* "grocery and household goods" stores, gas stations, "home repair, hardware and auto repair" stores, and "convenience stores." This exemption likewise permitted "big box" stores to continue operations.

29.     Businesses deemed "essential" are permitted to continue operations subject to the requirement—but only "to maximum extent practicable"—that they adhere to social distancing recommendations, maintaining a six-foot distance between individuals, and other measures recommended by various government agencies.

30.     Executive Order 19 also permitted "non-essential" businesses to continue provided in-person contact with customers is restricted, they do not require more than 10 employees in a space where distancing is not possible, and are facilitated by remote employees to the maximum extent practicable. These non-essential businesses include "shopping malls, theaters, casinos . . . exercise gyms . . . massage facilities . . ., and other personal care and treatment facilities."

31.     Violation of Executive Order 19 carried with it criminal and business licensing penalties.

32.     On March 31, 2020, Governor Mills issued Executive Order 28, which stated: "[a]ll persons living in the State of Maine are hereby ordered, effective as of 12:01 AM on <u>April 2, 2020</u> to stay at their homes or places of residence." A true and correct copy of Executive Order 28 is attached hereto as **EXHIBIT D** and incorporated herein.

33.     Executive Order 28 only permitted residents to travel out of their homes if they were conducting "essential" activities or traveling to work at a business allowed to continue operations.

34.     Executive Order 28 further restricted the functions of "essential" businesses by setting numerical limitations on the number of customers or patrons depending on the square footage of the building in which the business was located, permitting 5 people for buildings of less than 7,500 square feet, 15 people for buildings between 7,500 and 25,000 square feet, 50 people for buildings between 25,000 and 50,000 square feet, 75 people for buildings between 50,000 and 75,000 square feet, and 100 for buildings larger than 75,000 square feet.

35.     The exemption allowing "essential" businesses to operate subject to numerical limitations was not applicable to faith-based gatherings or churches, regardless of the size of the building in which such worship services take place.

36. Executive Order 28 stated that violations constituted a class E crime subject to up to six months in jail and a $1,000 fine.

37. On April 3, 2020, Governor Mills issued a list further explaining what businesses were considered "essential" and those deemed "non-essential" under the previous Executive Orders. A true and correct copy of Governor Mills' "Essential Business List" is attached hereto as **EXHIBIT E** and incorporated herein.

38. The list of "essential" businesses included grocery stores, household goods stores, gas stations, hardware stores, home repair stores, garden centers and stores, child care services, and **marijuana dispensaries**.

39. Executive Order 28 stated that its prohibitions were in effect until April 30, 2020.

40. On April 14, 2020, Governor Mills issued a Proclamation to Renew the State of Civil Emergency in Maine, extending the purported authorities in Maine to continue to order prohibitions on religious gatherings and business closures for another 30 days. A true and correct copy of the Proclamation Extension is attached hereto as **EXHIBIT F** and incorporated herein.

41. On April 29, 2020, Governor Mills issued Executive Order 49, further extending her stay-at-home orders until at least May 31. A true and correct copy of Executive Order 49 is attached hereto as **EXHIBIT G** and incorporated herein.

42. Executive Order 49 explicitly states that all of the prohibitions concerning "faith-based" gatherings remain in full effect, and that certain guidance documents would be made available concerning the potential re-opening of Maine's economy in the coming days.

43. Executive Order 49 states that the "Restarting Plan" would permit certain businesses and operations to reopen subject to the guidelines stated in the Restarting Plan, and that those businesses or activities allowed to open were "subject to change depending upon the demonstrated efficacy of the conditions imposed" on those businesses or activities.

44.     On April 28, 2020, Governor Mills released the "Restarting Maine's Economy" plan, further outlining the Governor's continued prohibitions on certain gatherings. A true and correct copy of the Restarting Maine's Economy plan is attached hereto as **EXHIBIT H** and incorporated herein.

45.     Restarting Maine's Economy contemplates that businesses and activities will be permitted to reopen in phases with "Stage 1" contemplated to begin sometime in May, but the plan states that no concrete decisions have been made and that "decisions will be determined by public health metrics."

46.     If Governor Mills does permit Stage 1 to commence sometime in May, although it is not certain based on the plan, certain functions at churches and "religious" gatherings will be permitted under Governor Mills' proscribed orthodoxy for worship services

47.     Stage 1 contemplates "a continued prohibition on gathering of more than 10 people."

48.     Restarting Maine's Economy states that churches or religious organizations, if permitted to open during Stage 1, will be "[l]imited to drive-in, stay-in-your-vehicle church services." Otherwise, as contemplated in Executive Order 49, the stay-at-home order remains in full effect prohibiting any gathering of individuals.

49.     Churches and religious gatherings are not mentioned in any of the subsequent stages, and thus no further guidance on the speculative "drive-in stay-in-your-vehicle church services" potentially coming sometime in May will continue beyond May or whether different circumstances and prohibitions will continue.

50.     Calvary Chapel hereinafter refers to Executive Order 14, Executive Order 19, Executive Order 28, Executive Order 49, and the Restarting Maine's Economy plan (EXHBITS A–H) collectively as the "GATHERING ORDERS."

**B.     THE STATE'S ENFORCEMENT OF GOVERNOR MILLS' GATHERING ORDERS.**

51.     On April 2, 2020, the Maine State Police issued press statements indicating that it will enforce Governor Mills' GATHERING ORDERS against churches and individuals found in violation of them. A true and correct copy of the Maine State Police's Enforcement Practices Memorandum is attached hereto as **EXHIBIT I** and incorporated herein.

52.     The Enforcement Memorandum states that while the Maine State Police is "asking for voluntary compliance" with the GATHERING ORDERS, the State Police will—in certain circumstances—"issu[e] summonses or mak[e] physical arrests" for violating the GATHERING ORDERS.

53.     The Enforcement Memorandum explicitly notes that the Maine State Police will be "ask[ing] questions to ensure compliance" and that it hopes residents of Maine will "not put our officers in the position of having to enforce the law."

54.     Through its Enforcement Memorandum, the Maine State Police has unquestionably demonstrated that it intends to enforce the GATHERING ORDERS, including against Calvary Chapel and its religious services.

**C.     CALVARY CHAPEL'S CHURCH SERVICES CAN AND WILL COMPLY WITH SOCIAL DISTANCING AND PERSONAL HYGIENE RECOMMENDATIONS.**

55.     To comply with the CDC and other governmental social distancing and personal hygiene guidelines imposed by Governor Mills' GATHERING ORDERS (*i.e.*, "to maximum extent practicable" for exempted businesses) for its worship services, Calvary Chapel can and would practice stringent social distancing and personal hygiene protocols, including extensive and enhanced sanitizing of common surfaces in Calvary Chapel's building prior to the service, and

requiring attendees to remain at least six feet apart and use hand sanitizer prior to entering and during movement inside Calvary Chapel's building.

56.     Calvary Chapel also has the capability to abide by all of the guidelines set out by the Maine Center for Disease Control and Prevention and will implement all such guidelines at its in-person religious gatherings.

### D.     GOVERNOR MILLS' UNEQUAL TREATMENT OF NON-RELIGIOUS GATHERINGS.

57.     On May 3, 2020, at around the same time as Calvary Chapel was prohibited from hosting its in-person religious worship services, businesses in Bangor and the surrounding area were permitted to and did continue to operate without the onerous restrictions imposed on Calvary Chapel.

58.     As accurately depicted in the below photographs, on May 3, 2020, around the same time that Calvary Chapel was prohibited from having a religious gathering, the Walmart in Bangor had hundreds of cars parked in the parking lot, right next to one another without the onerous social distancing mandates forced on Calvary Chapel.





59. Similarly, and as accurately depicted in the below photograph, on May 3, 2020, at the Target Store in Bangor, countless cars were present in the parking lot while Calvary Chapel was suffering under the yoke of the GATHERING ORDERS.



60. As accurately depicted in the below photographs, on May 3, 2020, the Home Depot in Bangor was similarly permitted to continue operating with large numbers of people while Calvary Chapel was threatened with enforcement under the GATHERING ORDERS.







61.     As accurately depicted in the below photograph, the BJ's Wholesale Club similarly had large gatherings on May 3, 2020 without the restrictions imposed on Calvary Chapel's religious services.



62.     As accurately depicted in the below photograph, the Sam's Club in Bangor had similar large gatherings on May 3, 2020, while Calvary Chapel was not permitted to host its religious gatherings of a similar nature.



63.    Finally, and as accurately depicted in the below photographs, Lowe's Home Improvement Store's parking lot was filled with cars on May 3, 2020, while Calvary Chapel was prohibited from having such gatherings for its religious services.





### E.    LESS RESTRICTIVE ALTERNATIVES ARE AVAILABLE TO GOVERNOR MILLS.

64.    Despite Governor Mills' insistence that in-person religious gatherings of more than 10 people cannot continue because they would spread COVID-19, the State has failed to consider other, substantially less restrictive alternatives to an absolute prohibition on "religious" gatherings.

65.    Like the State of Maine, the State of Florida has issued stay-at-home executive orders and required the closure of all so-called "non-essential" businesses without unnecessarily discriminating against religious gatherings. On April 1, 2020, Florida Governor Ron DeSantis issued Executive Order 20-91, which **included "religious services conducted in churches, synagogues, and houses of worship" as essential activities permitted to continue subject to social distancing and personal hygiene guidelines**. A true and correct copy of Florida Executive Order 20-91 is attached hereto as **EXHIBIT J** and incorporated herein.

66.    The State of Indiana has likewise issued stay-at-home executive orders and required the closure of all so-called "non-essential" businesses without unnecessarily discriminating against religious gatherings. Governor Eric. J. Holcomb's Executive Order 20-08 declared that "[r]eligious facilities, entities and groups, and religious gatherings" are essential and may continue to operate provided they follow appropriate social distancing and personal hygiene practices. A true and correct copy of Indiana's Executive Order 20-08 is attached hereto as **EXHIBIT K** and incorporated herein.

67.    The State of Arizona, in Executive Order 2020-18, classified "[e]ngaging in constitutionally protected activities such as speech and religion" as essential activities, subject to a flexible requirement that such engagement be "conducted in a manner that provides appropriate physical distancing to the extent feasible." The Arizona Attorney General, in Opinion I20-008, interpreted such essential activities clearly to include assembling for religious worship. True and

correct copies of Arizona Executive Order 2020-18 and Arizona Attorney General Opinion I20-008 are attached hereto as **EXHIBIT L** and **EXHIBIT M**, respectively, and incorporated herein.

68.     The State of Alabama, in its final Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of Infection by COVID-19, issued April 3, 2020, exempts individuals attending religious worship services in person subject to certain requirements and permits "drive-in" worship services without limitation. A true and correct copy of the Alabama Order is attached hereto as **EXHIBIT N** and incorporated herein.

69.     The State of Arkansas has likewise exempted "places of worship" from its Executive Order 20-13 imposing restrictions to prevent the spread of COVID-19, provided that they engage in adequate social distancing and personal hygiene practices. A true and correct copy of the Arkansas Executive Order is attached hereto as **EXHIBIT O** and incorporated herein.

70.     The State of Connecticut has similarly shown that other, less restrictive alternatives are available. In Executive Order No. 7N, Governor Ned Lamont permitted religious services to continue to meet, but limited their in-person gatherings to 50 people, as opposed to the six-person limit applicable to other gatherings. A true and correct copy of the Connecticut Executive Order No. 7N is attached hereto as **EXHIBIT P** and incorporated herein.

71.     The State of Texas has likewise issued certain COVID-19 orders, but has provided explicit protections to religious gatherings and issued directives outlining the protection for religious freedom, even in these times of uncertainty. A true and correct copy of the Texas Guidance for Houses of Worship is attached hereto as **EXHIBIT Q** and incorporated herein. In that Guidance, Texas notes that religious assemblies and houses of worship are "essential services" and that in-person gatherings are permissible if social distancing and personal hygiene practices are followed.

72.    The State of Ohio has likewise issued certain COVID-19 orders, including the Ohio Department of Health's Stay Safe Ohio Order. A true and correct copy of the Ohio order is attached hereto as **EXHIBIT R** and incorporated herein. Ohio's order likewise states that the stay at home mandate "does not apply to religious facilities, entities and groups and religious gatherings."

73.    Numerous other states have similarly permitted religious gatherings to be treated equally with non-religious gatherings.

74.    As these other states have demonstrated, Governor Mills can continue to pursue the State's objective of preventing the spread of COVID-19 without unnecessarily treating religious gatherings in a discriminatory manner, and the State has numerous other, less restrictive alternatives available to it to do so.

75.    **Governor Mills has neither tried without success nor considered and ruled out for good reason these less restrictive alternatives**.

76.    Governor Mills has constitutionally permissible alternatives available, but has failed to attempt to achieve the State's purported goals without unnecessarily interfering with constitutionally protected activities.

**F.    IRREPARABLE INJURY TO CALVARY CHAPEL FROM GOVERNOR MILLS' GATHERING ORDERS.**

77.    Despite being capable of following all social distancing and personal hygiene protocols recommended by the CDC and specified in the GATHERING ORDERS, Calvary Chapel has been explicitly targeted, singled out, and punished for participating in an in-person religious gathering when exempted commercial and non-religious entities may accommodate gatherings, crowds, and masses of people without numeric limitation, and without targeting or punishment by the government.

78.     As a result of Governor Mills' GATHERING ORDERS, Calvary Chapel has suffered and is suffering irreparable injury by having Pastor Graves and all attendees of future services threatened with criminal sanction.

79.     As a result of Governor Mills' GATHERING ORDERS, Calvary Chapel has suffered and is suffering irreparable injury by being prohibited from engaging in its constitutionally and statutorily protected rights of free exercise, assembly, and speech.

80.     As a result of Governor Mills' GATHERING ORDERS, Calvary Chapel has suffered and is suffering irreparable injury by the infringement of its constitutionally protected right to be free from government hostility toward religion.

81.     As a result of the Governor Mills' GATHERING ORDERS and the explicit threats from the Maine State Police, Calvary Chapel has suffered and is suffering irreparable injury by the continuing threat of criminal sanctions against Calvary Chapel's Pastor Graves and congregants for merely exercising their constitutionally protected freedoms.

82.     Due to the explicit threats of Governor Mills' GATHERING ORDERS and the announcements by the Maine State Police, Calvary Chapel has been forced to self-censor, cease its religious worship services, and violate its sincerely held religious beliefs.

**G.     CALVARY CHAPEL'S ATTEMPTS TO SECURE RELIEF WITHOUT JUDICIAL INTERVENTION WERE IGNORED AND FURTHER ATTEMPTS TO NOTIFY THE STATE ARE FUTILE AND IMPRACTICAL BEFORE THIS SUNDAY.**

83.     On May 4, 2020, prior to the commencement of the instant action, Calvary Chapel's counsel sent by email a demand letter to Governor Mills, with copies to state and local police and other officials, in which Calvary Chapel's counsel demanded, by 5:00 P.M. on May 5, written confirmation that the State has withdrawn the ban on religious gatherings embodied in the GATHERING ORDERS, will allow individuals to attend church services at Calvary Chapel in an

equal manner with other essential and non-essential business permitted to continue provided certain social distancing and personal hygiene practices are followed, and will cease enforcement of any church gathering ban against members and/or attendees of Calvary Chapel church services. A true and correct copy of the demand letter is attached hereto as **EXHIBIT S**. No written response from Governor Mills' office was received by the requested deadline, or at any time prior to the filing of this Verified Complaint.

84.     The failure of Governor Mills or her officials to confirm withdrawal or cessation of enforcement of the discriminatory gathering ban for religious services in the GATHERING ORDERS and applied to Calvary Chapel and its pastor shows that Calvary Chapel's irreparable injury to its constitutionally protected freedoms is ongoing.

85.     The failure of Governor Mills or her officials to respond to Calvary Chapel's communication also shows that notice and an opportunity to respond to this lawsuit cannot be effectuated, and would be futile, prior to this Sunday's worship activities at Calvary Chapel, when the State and/or other government officials will again interfere with the constitutional liberties of Calvary Chapel and its congregants absent a temporary restraining order from this Court.

### <u>CONSTITUTIONAL CLAIMS</u>

**COUNT I—THE GATHERING ORDERS VIOLATE
PLAINTIFF'S RIGHT TO FREE EXERCISE OF RELIGION
UNDER THE FIRST AMENDMENT**

86.     Calvary Chapel hereby realleges and adopts each and every allegation in paragraphs 1–85 above.

87.     The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the State from abridging Calvary Chapel's rights to free exercise of religion.

88.     Calvary Chapel has sincerely held religious beliefs that Scripture is the infallible, inerrant word of the Lord Jesus Christ, and that it is to follow its teachings.

89.     Calvary Chapel has sincerely held religious beliefs, rooted in Scripture's commands (*e.g.*, *Hebrews* 10:25), that followers of Jesus Christ are not to forsake the assembling of themselves together, and that they are to do so even more in times of peril and crisis. Indeed, the entire purpose of the Church (in Greek "ekklesia," meaning "assembly") is to assemble together Christians to worship Almighty God.

90.     The GATHERING ORDERS, on their face and as applied, target Calvary Chapel's sincerely held religious beliefs by prohibiting religious gatherings.

91.     The GATHERING ORDERS, on their face and as applied, impermissibly burden Calvary Chapel's sincerely held religious beliefs, compel Calvary Chapel to either change those beliefs or to act in contradiction to them, and force Calvary Chapel to choose between the teachings and requirements of its sincerely held religious beliefs in the commands of Scripture and the State's imposed value system.

92.     The GATHERING ORDERS, on their face and as applied, place Calvary Chapel in an irresolvable conflict between compliance with the GATHERING ORDERS and its sincerely held religious beliefs.

93.     The GATHERING ORDERS, on their face and as applied, put substantial pressure on Calvary Chapel to violate its sincerely held religious beliefs by ignoring the fundamental teachings and tenets of Scripture concerning the assembling of Believers.

94.     The GATHERING ORDERS, on their face and as applied, are neither neutral nor generally applicable, but rather specifically and discriminatorily target the religious beliefs, speech, assembly, and viewpoint of Calvary Chapel.

23

95.     The GATHERING ORDERS, on their face and as applied, constitute a substantial burden on Calvary Chapel's sincerely held religious beliefs.

96.     The State lacks a compelling, legitimate, or rational interest in the GATHERING ORDERS' application of different standards for churches and religious gatherings than those applicable to exempted businesses or non-religious entities.

97.     Even if the GATHERING ORDERS' restriction on religious gatherings were supported by a compelling interest, which it is not, they are not the least restrictive means to accomplish the government's purported interest.

98.     The GATHERING ORDERS, on their face and as applied, fail to accommodate Calvary Chapel's sincerely held religious beliefs.

99.     The GATHERING ORDERS, on their face and as applied, specifically target Calvary Chapel's sincerely held religious beliefs and set up a system of individualized exemptions that permits certain other similarly situated businesses or non-religious entities to continue operations under certain guidelines while prohibiting religious gatherings, such as Calvary Chapel's church and worship services, from operating with similar guidelines.

100.    The GATHERING ORDERS, on their face and as applied, constitute an express and overt religious gerrymander.

101.    The GATHERING ORDERS, on their face and as applied, have caused, are causing, and will continue to cause Calvary Chapel immediate and irreparable harm, and actual and undue hardship.

102.    Calvary Chapel has no adequate remedy at law to correct the continuing deprivation of its most cherished liberties.

WHEREFORE, Calvary Chapel respectfully prays for relief against the State as hereinafter set forth in its prayer for relief.

## COUNT II—THE GATHERING ORDERS VIOLATE
## PLAINTIIFF'S RIGHT TO PEACEABLE ASSEMBLY
## UNDER THE FIRST AMENDMENT

103.    Calvary Chapel hereby realleges and adopts each and every allegation in paragraphs 1–85 above.

104.    The First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the State from abridging the right of the people peaceably to assemble.

105.    The GATHERING ORDERS, on their face and as applied, are an unconstitutional prior restraint on Calvary Chapel's right to assemble.

106.    The GATHERING ORDERS, on their face and as applied, unconstitutionally discriminate on the basis of viewpoint.

107.    The GATHERING ORDERS, on their face and as applied, unconstitutionally discriminate on the basis of content.

108.    The State lacks a compelling, legitimate, or rational interest in the GATHERING ORDERS' application of differential standards for churches and religious gatherings than those applicable to exempted businesses or non-religious entities.

109.    The GATHERING ORDERS, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served by the orders.

110.    The GATHERING ORDERS, on their face and as applied, are not narrowly tailored to serve the government's purported interest.

111.    The GATHERING ORDERS, on their face and as applied, do not leave open ample alternative channels of communication for Calvary Chapel.

112.    The GATHERING ORDERS, on their face and as applied, are irrational and unreasonable and impose unjustifiable and unreasonable restrictions on Calvary Chapel's constitutionally protected right to assemble.

113.    The GATHERING ORDERS, on their face and as applied, impermissibly vest unbridled discretion in the hands of government officials, including Governor Mills and her designees, to apply or not apply the GATHERING ORDERS in a manner to restrict free assembly.

114.    The GATHERING ORDERS, on their face and as applied, are underinclusive by limiting their gathering prohibitions to only certain businesses or organizations deemed "non-essential."

115.    The GATHERING ORDERS, on their face and as applied, are unconstitutionally vague and overbroad as they chill and abridge the free assembly rights of Calvary Chapel.

116.    On their face and as applied, the GATHERING ORDERS' violation of Calvary Chapel's right to free assembly have caused, are causing, and will continue to cause Calvary Chapel to suffer immediate and irreparable injury and undue and actual hardship.

117.    Calvary Chapel has no other adequate remedy at law to correct the continuing deprivation of its most cherished liberties.

WHEREFORE, Calvary Chapel respectfully prays for the relief against the State as hereinafter set forth in its prayer for relief.

### COUNT III - THE GATHERING ORDERS VIOLATE
### PLAINTIFF'S RIGHTS TO FREEDOM OF SPEECH
### UNDER THE FIRST AMENDMENT

118.    Calvary Chapel hereby realleges and adopts each and every allegation in paragraphs 1–85 above.

119.     The Free Speech Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the State from abridging Calvary Chapel's freedom of speech.

120.     The GATHERING ORDERS, on their face and as applied, are an unconstitutional prior restraint on Calvary Chapel's speech.

121.     The GATHERING ORDERS, on their face and as applied, unconstitutionally discriminate on the basis of viewpoint.

122.     The GATHERING ORDERS, on their face and as applied, unconstitutionally discriminate on the basis of content.

123.     The State lacks a compelling, legitimate, or rational interest in the GATHERING ORDERS' application of different standards for churches and religious gatherings than those applicable to exempted businesses and non-religious entities.

124.     The GATHERING ORDERS, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served by the orders.

125.     The GATHERING ORDERS, on their face and as applied, are not narrowly tailored to serve the government's purported interest.

126.     The GATHERING ORDERS, on their face and as applied, do not leave open ample alternative channels of communication for Calvary Chapel.

127.     The GATHERING ORDERS, on their face and as applied, are irrational and unreasonable and impose unjustifiable and unreasonable restrictions on Calvary Chapel's constitutionally protected speech.

128.    The GATHERING ORDERS, on their face and as applied, impermissibly vest unbridled discretion in the hands of government officials, including Governor Mills and her designees, to apply or not apply the GATHERING ORDERS in a manner to restrict free speech.

129.    The GATHERING ORDERS, on their face and as applied, are underinclusive by limiting their prohibitions to only certain entities, organizations, or businesses deemed "non-essential."

130.    The GATHERING ORDERS, on their face and as applied, are unconstitutionally overbroad as they chill and abridge the free speech rights of Calvary Chapel.

131.    On their face and as applied, the GATHERING ORDERS' violation of Calvary Chapel's rights to free speech have caused, are causing, and will continue to cause Calvary Chapel to suffer immediate and irreparable injury and undue and actual hardship.

132.    Calvary Chapel has no other adequate remedy at law to correct the continuing deprivation of its most cherished liberties.

WHEREFORE, Calvary Chapel respectfully prays for the relief against the State as hereinafter set forth in its prayer for relief.

## COUNT IV—THE GATHERING ORDERS VIOLATE
## THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT

133.    Calvary Chapel hereby realleges and adopts each and every allegation in paragraphs 1–85 above.

134.    The Establishment Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the government from establishing a religion.

135.    The Establishment Clause also prohibits excessive government entanglement with religion.

136.    The Establishment Clause also prohibits the government from showing hostility towards religion and prohibits showing favoritism towards one religious sect over another or between non-religion and religion.

137.    The government mandated prohibition on "faith-based" gatherings in the GATHERING ORDERS violates the Establishment Clause because the State of Maine thereby dictates the manner in which Christians and churches must worship or worship online.

138.    The Establishment Clause does not permit the State of Maine to dictate under penalty of criminal sanctions the manner, style, form, practices, or sacraments of religious worship and thereby impose its own version of religious worship on every church and citizen of the State.

139.    In fact, as the Supreme Court has unequivocally stated, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, **religion**, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (emphasis added).

140.    The State, through Governor Mills' GATHERING ORDERS, is purporting to prescribe what shall be orthodox in matters of religious worship, and is thus running roughshod over the Establishment Clause.

141.    The GATHERING ORDERS, on their face and as applied, permit the State to display impermissible hostility towards religious gatherings.

142.    The GATHERING ORDERS, on their face and as applied, impermissibly show favoritism towards certain non-religious gatherings over religious gatherings.

143.    The GATHERING ORDERS, on their face and as applied, violate the Establishment Clause because they excessively entangle the government with religion.

144.    The GATHERING ORDERS, on their face and as applied, purport to inform religious adherents and believers how they may choose to worship, assemble together, or engage in their religious freedoms.

145.    The GATHERING ORDERS, on their face and as applied, purport to establish an acceptable method of religious practice and worship, place a numerical limitation on the scope of how such religious practice and worship may occur, and provide a government imprimatur for only certain forms of "permissible" worship.

146.    The GATHERING ORDERS, on their face and as applied, demonstrate overt hostility to religious practice and worship that does not conform to government sanctioned religious exercises.

147.    The GATHERING ORDERS, on their face and as applied, have caused, are causing, and will continue to cause Calvary Chapel immediate and irreparable harm, and actual and undue hardship.

148.    Calvary Chapel has no adequate remedy at law to correct the continuing deprivation of its most cherished constitutional liberties.

WHEREFORE, Calvary Chapel respectfully prays for the relief against the State as hereinafter set forth in their prayer for relief.

### COUNT V—THE GATHERING ORDERS VIOLATE PLAINTIFF'S RIGHT TO EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT

149.    Calvary Chapel hereby realleges and adopts each and every allegation in paragraphs 1–85 above.

150.    The Fourteenth Amendment to the United States Constitution guarantees Calvary Chapel the right to equal protection under the law.

151.     The GATHERING ORDERS, on their face and as applied, are an unconstitutional abridgement of Calvary Chapel's right to equal protection under the law, are not neutral, and specifically target Calvary Chapel's and other religious gatherings for unequal treatment.

152.     The GATHERING ORDERS, on their face and as applied, are an unconstitutional abridgment of Calvary Chapel's right to equal protection because they permit the State to treat Calvary Chapel differently from other similarly situated businesses and non-religious entities on the basis of the content and viewpoint of Calvary Chapel's gatherings.

153.     The GATHERING ORDERS create a system of exempt categories that permit essential businesses and gatherings to continue to operate with restriction or threat of sanction, and impose disparate treatment to those categories of businesses and gatherings called "non-essential."

154.     The GATHERING ORDERS system of categories represents disparate treatment based upon classification in violation equal protection.

155.     The GATHERING ORDERS, on their face and as applied, impermissibly discriminate between certain non-religious gatherings and religious gatherings.

156.     The State lacks a compelling, legitimate, or rational interest in the GATHERING ORDERS' application of different standards for churches and religious gatherings than those applicable to exempted businesses or non-religious entities.

157.     The GATHERING ORDERS, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served.

158.     The GATHERING ORDERS, on their face and as applied, do not have a rational basis.

159.     The GATHERING ORDERS, on their face and as applied, are irrational and unjustifiable and impose irrational and unjustifiable restrictions on Calvary Chapel's religious gatherings.

160.   The GATHERING ORDERS, on their face and as applied, have caused, are causing, and will continue to cause Calvary Chapel immediate and irreparable harm, and actual and undue hardship.

161.   Calvary Chapel has no adequate remedy at law to correct the continuing deprivation of its most cherished liberties.

WHEREFORE, Calvary Chapel respectfully prays for relief against the State as hereinafter set forth in its prayer for relief.

## COUNT VI—THE GATHERING ORDERS VIOLATE PLAINTIFF'S RIGHT TO A REPUBLICAN FORM OF GOVERNMENT UNDER THE GUARANTEE CLAUSE OF ARTICLE IV, § 4 OF THE UNITED STATES CONSTITUTION

162.   Calvary Chapel hereby realleges and adopts each and every allegation in paragraphs 1–85 above.

163.   Article IV, § 4 of the United States Constitution requires the United States to guarantee to every citizen in the nation a republican form of government.

164.   The Guarantee Clause's distinguishing feature is that the republican form of government it guarantees is the right of the people to choose their own governmental administration and pass their own laws.

165.   As interpreted by the federal judiciary and prominent scholars, the Guarantee Clause mandates that the federal government guarantee a form of government for all citizens in which supreme power resides in a body of citizens entitled to vote and exercised by elected officers responsible to such citizens.

166.   The GATHERING ORDERS' express, unilateral, and unequivocal exercises of purported executive authority over the constitutional rights of Calvary Chapel deprive Calvary Chapel of the right to select its own government administration, pass its own laws, and maintain a

government administration directly responsible to the people, including by laws that are enacted by the legislature in constitutional recognition of the separation of powers.

167.    The impermissible exercise of exclusive and unaccountable executive authority violates the Guarantee Clause of the United States Constitution.

168.    The GATHERING ORDERS, on their face and as applied, have caused, are causing, and will continue to cause Calvary Chapel immediate and irreparable harm, and actual and undue hardship.

169.    Calvary Chapel has no adequate remedy at law to correct the continuing deprivation of its most cherished liberties.

WHEREFORE, Calvary Chapel respectfully prays for the relief against the State as hereinafter set forth in its prayer for relief.

### COUNT VII—THE GATHERING ORDERS VIOLATE PLAINTIFF'S RIGHT TO FREE EXERCISE OF RELIGION UNDER ARTICLE I, SECTION 3 OF THE CONSTITUTION OF THE STATE OF MAINE

170.    Calvary Chapel hereby realleges and adopts each and every allegation in paragraphs 1–85 above.

171.    Article I, § 3 of the Constitution of the State of Maine states:

**All individuals have a natural and unalienable right to worship Almighty God according to the dictates of their own consciences**, and no person shall be hurt, molested or restrained in that person's liberty or estate for worshipping God in the manner and season most agreeable to the dictates of that person's own conscience, nor for that person's religious professions or sentiments, **provided that that person does not disturb the public peace, nor obstruct others in their religious worship**;—and all persons demeaning themselves peaceably, as good members of the State, shall be equally under the protection of the laws . . . .

(Emphasis added.)

172.    Calvary Chapel has sincerely held religious beliefs that Scripture is the infallible, inerrant word of the Lord Jesus Christ, and that it is to follow its teachings.

173.    Calvary Chapel has sincerely held religious beliefs, rooted in Scripture's commands (*e.g.*, *Hebrews* 10:25), that followers of Jesus Christ are not to forsake the assembling of themselves together, and that they are to do so even more in times of peril and crisis. Indeed, the entire purpose of the Church (in Greek "ekklesia," meaning "assembly") is to assemble together Christians to worship Almighty God.

174.    The GATHERING ORDERS, on their face and as applied, target Calvary Chapel's sincerely held religious beliefs by prohibiting religious gatherings.

175.    The GATHERING ORDERS, on their face and as applied, impermissibly burden Calvary Chapel's sincerely held religious beliefs, compel Calvary Chapel to either change those beliefs or to act in contradiction to them, and force Calvary Chapel to choose between the teachings and requirements of its sincerely held religious beliefs in the commands of Scripture and the State's imposed value system.

176.    The GATHERING ORDERS, on their face and as applied, place Calvary Chapel in an irresolvable conflict between compliance with the GATHERING ORDERS and its sincerely held religious beliefs.

177.    The GATHERING ORDERS, on their face and as applied, put substantial pressure on Calvary Chapel to violate its sincerely held religious beliefs by ignoring the fundamental teachings and tenets of Scripture concerning the assembling of Believers.

178.    The GATHERING ORDERS, on their face and as applied, are neither neutral nor generally applicable, but rather specifically and discriminatorily target the religious beliefs, speech, assembly, and viewpoint of Calvary Chapel.

179.    The GATHERING ORDERS, on their face and as applied, constitute a substantial burden on Calvary Chapel's sincerely held religious beliefs.

180.    The State lacks a compelling, legitimate, or rational interest in the GATHERING ORDERS' application of different standards for churches and religious gatherings than those applicable to exempted businesses or non-religious entities.

181.    Even if the GATHERING ORDERS' restriction on religious gatherings were supported by a compelling interest, which it is not, they are not the least restrictive means to accomplish the government's purported interest.

182.    The GATHERING ORDERS, on their face and as applied, fail to accommodate Calvary Chapel's sincerely held religious beliefs.

183.    The GATHERING ORDERS, on their face and as applied, specifically target Calvary Chapel's sincerely held religious beliefs and set up a system of individualized exemptions that permits certain other similarly situated businesses or non-religious entities to continue operations under certain guidelines while prohibiting religious gatherings, such as Calvary Chapel's church and religious gatherings, from operating with similar guidelines.

184.    The GATHERING ORDERS, on their face and as applied, constitute an express and overt religious gerrymander.

185.    The GATHERING ORDERS, on their face and as applied, have caused, are causing, and will continue to cause Calvary Chapel immediate and irreparable harm, and actual and undue hardship.

186.    Calvary Chapel has no adequate remedy at law to correct the continuing deprivation of its most cherished liberties.

WHEREFORE, Calvary Chapel respectfully prays for relief against the State as hereinafter set forth in its prayer for relief.

## COUNT VIII—THE GATHERING ORDERS VIOLATE
## PLAINTIFF'S RIGHT TO FREEDOM OF SPEECH UNDER
## ARTICLE I, SECTION 4 OF THE CONSTITUTION OF THE STATE OF MAINE

187.     Calvary Chapel hereby realleges and adopts each and every allegation in paragraphs 1–85 above.

188.     Article I, Section 4 of the Constitution of the State of Maine states that "[e]very citizen may freely speak, write and publish sentiments on any subject."

189.     The GATHERING ORDERS, on their face and as applied, are an unconstitutional prior restraint on Calvary Chapel's speech.

190.     The GATHERING ORDERS, on their face and as applied, unconstitutionally discriminate on the basis of viewpoint.

191.     The GATHERING ORDERS, on their face and as applied, unconstitutionally discriminate on the basis of content.

192.     The State lacks a compelling, legitimate, or rational interest in the GATHERING ORDERS' application of different standards for churches and religious gatherings than those applicable to exempted businesses and non-religious entities.

193.     The GATHERING ORDERS, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served by the orders.

194.     The GATHERING ORDERS, on their face and as applied, are not narrowly tailored to serve the government's purported interest.

195.     The GATHERING ORDERS, on their face and as applied, do not leave open ample alternative channels of communication for Calvary Chapel.

196.    The GATHERING ORDERS, on their face and as applied, are irrational and unreasonable and impose unjustifiable and unreasonable restrictions on Calvary Chapel's constitutionally protected speech and right to assemble.

197.    The GATHERING ORDERS, on their face and as applied, impermissibly vest unbridled discretion in the hands of government officials, including Governor Mills and her designees, to apply or not apply the GATHERING ORDERS in a manner to restrict free speech and assembly.

198.    The GATHERING ORDERS, on their face and as applied, are underinclusive by limiting their prohibitions to only certain entities, organizations, or businesses deemed "non-essential."

199.    The GATHERING ORDERS, on their face and as applied, are unconstitutionally overbroad as they chill and abridge the free speech and assembly rights of Calvary Chapel.

200.    On their face and as applied, the GATHERING ORDERS' violation of Calvary Chapel's rights to free speech and assembly have caused, are causing, and will continue to cause Calvary Chapel to suffer immediate and irreparable injury and undue and actual hardship.

201.    Calvary Chapel has no other adequate remedy at law to correct the continuing deprivation of its most cherished liberties.

WHEREFORE, Calvary Chapel respectfully prays for the relief against the State as hereinafter set forth in its prayer for relief.

### COUNT IX—THE GATHERING ORDERS VIOLATE PLAINTIFF'S RIGHT TO HAVE LAWS SUSPENDED ONLY BY THE MAINE LEGISLATURE

202.    Calvary Chapel hereby realleges and adopts each and every allegation in paragraphs 1–85 above.

203.    Article I, Section 13 of the Constitution of the State of Maine states that "[t]he laws shall not be suspended but by the Legislature or its authority."

204.    The GATHERING ORDERS' express, unilateral, and unequivocal exercise of purported executive authority over the constitutional rights of Calvary Chapel deprive Calvary Chapel of the right to select its own government administration, pass its own laws, and maintain a government administration directly responsible to the people, including by laws that are enacted by the legislature.

205.    The impermissible exercise of such executive authority violated the Constitution of Maine by purporting to suspend constitutional rights and laws of the State without legislative exercise of such suspension.

206.    The GATHERING ORDERS, on their face and as applied, have caused, are causing, and will continue to cause Calvary Chapel immediate and irreparable harm, and actual and undue hardship.

207.    Calvary Chapel has no adequate remedy at law to correct the continuing deprivation of its most cherished liberties.

WHEREFORE, Calvary Chapel respectfully prays for the relief against the State as hereinafter set forth in its prayer for relief.

## STATUTORY CLAIMS

### COUNT X—THE GATHERING ORDERS VIOLATE PLAINTIFF'S RIGHTS UNDER THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT

208.    Calvary Chapel hereby realleges and adopts each and every allegation in paragraphs 1–85 above.

209.    The Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc–2000cc-5 ("RLUIPA"), states that "[n]o government shall impose or implement a land use

38

regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution." 42 U.S.C. § 2000cc(a)(1). If the government does impose such a restriction, it must then demonstrate that such a burden on the religious assembly is supported by a compelling interest and is the least restrictive means to further that alleged interest.

210.    RLUIPA further mandates that no government "impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1).

211.    RLUIPA further states that "[n]o government shall impose or implement a land use regulation that (A) totally excludes religious assemblies from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." 42 U.S.C. § 2000cc(b)(3).

212.    Calvary Chapel has sincerely held religious beliefs that Scripture is the infallible, inerrant word of the Lord Jesus Christ, and that Calvary Chapel is to follow its teachings.

213.    Calvary Chapel has sincerely held religious beliefs, rooted in Scripture's commands (*e.g.*, *Hebrews* 10:25), that followers of Jesus Christ are not to forsake the assembling of themselves together, and that they are to do so even more in times of peril and crisis. Indeed, the entire purpose of the Church (in Greek "ekklesia," meaning "assembly") is to assemble together Christians to worship Almighty God.

214.    The GATHERING ORDERS, on their face and as applied, target Calvary Chapel's sincerely held religious beliefs by prohibiting religious gatherings.

215.    The GATHERING ORDERS, on their face and as applied, impermissibly and substantially burden Calvary Chapel's sincerely held religious beliefs, compel Calvary Chapel to either change those beliefs or to act in contradiction to them, and force Calvary Chapel to choose

between the teachings and requirements of its sincerely held religious beliefs in the commands of Scripture and the State's imposed value system.

216.    The GATHERING ORDERS, on their face and as applied, constitute a substantial burden on Calvary Chapel's sincerely held religious beliefs.

217.    The State lacks a compelling interest in the GATHERING ORDERS' application of different standards for churches and religious gatherings than those applicable to exempted businesses and non-religious entities.

218.    Even if the GATHERING ORDERS' restrictions on religious gatherings was supported by a compelling interest, which it is not, they are not the least restrictive means to accomplish the government's purported interest.

219.    The GATHERING ORDERS, on their face and as applied, have caused, are causing, and will continue to cause Calvary Chapel immediate and irreparable harm, and actual and undue hardship.

220.    Calvary Chapel has no adequate remedy at law to correct the continuing deprivation of its most cherished liberties.

WHEREFORE, Calvary Chapel respectfully prays for relief against the State as hereinafter set forth in its prayer for relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Calvary Chapel prays for relief as follows:

A.    That the Court issue a Temporary Restraining Order restraining and enjoining Governor Mills, all State officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, from enforcing, attempting to enforce, threatening to enforce, or otherwise requiring compliance with the GATHERING ORDERS or any other order to the extent any such order prohibits religious worship services at Calvary Chapel, or in-person church

services at Calvary Chapel if Calvary Chapel meets the social distancing, enhanced sanitization, and personal hygiene guidelines pursuant to which the State allows so-called "essential" commercial and non-religious entities (*e.g.*, beer, wine, and liquor stores, warehouse clubs, 'big box' and 'supercenter' stores, and marijuana dispensaries) to accommodate gatherings of persons without numerical limit. **To be clear, Calvary Chapel merely seeks a TRO preventing Calvary Chapel, its pastor, and its members from being subject to criminal sanctions for hosting an in-person worship service on Sunday during which Calvary Chapel will implement social distancing and hygiene protections on an equal basis with other non-religious gatherings**. In making such a request, Calvary Chapel merely seeks to be treated equally with other businesses, and seeks only to be permitted to meet in person so long as they abide by social distancing, enhanced sanitizing, and personal hygiene recommendations that other businesses are allowed to follow and remain open.

B.     That the Court issue a Preliminary Injunction pending trial, and a Permanent Injunction upon judgment, restraining and enjoining Governor Mills, all State officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, from enforcing the GATHERING ORDERS so that:

i.     The State will not apply the GATHERING ORDERS in any manner as to infringe Calvary Chapel's constitutional and statutory rights by discriminating against their right to assembly, speech, free exercise of religion, equal protection, and all other constitutional and statutory rights outlined herein;

ii.    The State will apply the GATHERING ORDERS in a manner that treats Calvary Chapel's religious gatherings on equal terms as gatherings for or in so-called "essential" businesses and non-religious entities;

iii.    The State will permit religious gatherings so long as they comply with the same social distancing and personal hygiene recommendations pursuant to which the State allows so-called "essential" commercial and non-religious entities (*e.g.*, beer, wine, and liquor stores, warehouse clubs, and supercenters) to accommodate gatherings of persons without numerical limit under the GATHERING ORDERS;

iv.    The State will permit Calvary Chapel the opportunity to comport their behavior to any further limitations or restrictions that the State may impose in any future modification, revision, or amendment of the GATHERING ORDERS or similar legal directive;

v.    The State will cease issuing notices of criminal violation to Calvary Chapel's Pastor, members, and/or attendees; and

vii.    The State will not bring any further enforcement, criminal, or other public health actions against Calvary Chapel as threatened in Governor Mills' public statements.

C.    That the Court render a Declaratory Judgment declaring that the GATHERING ORDERS both on their face and as applied by the State are unconstitutional under the United States Constitution and Constitution of Maine, and further declaring that:

i.    The State has violated Calvary Chapel's rights to freedom of assembly by impermissibly prohibiting religious gatherings;

ii.    The State has violated Calvary Chapel's rights to freedom of speech by impermissibly prohibiting religious gatherings;

iii.    The State has violated Calvary Chapel's rights to free exercise of religion by impermissibly prohibiting religious gatherings, substantially burdening

their sincerely held religious beliefs, applying criteria that are neither neutral nor generally applicable to religious and non-religious gatherings, by establishing a religious gerrymander against religious gatherings, and by establishing a system of individualized exemptions that exclude similarly situated non-religious gatherings from the prohibitions applicable to Calvary Chapel's religious gatherings;

iv. The State has violated Calvary Chapels' rights to equal protection of the laws by impermissibly prohibiting religious gatherings, and by applying criteria that treats religious gatherings in a discriminatory and dissimilar manner as that applied to various non-religious gatherings;

v. The State has violated the Establishment Clause by impermissibly demonstrating hostility towards religious gatherings and by impermissibly showing favoritism to certain non-religious gatherings;

vi. The State has violated the Guarantee Clause by impermissibly exercising executive authority in an unconstitutional manner; and

vii. The State has violated the Religious Land Use and Institutionalized Persons Act by substantially and impermissibly burdening Calvary Chapel's sincerely held religious beliefs and treating unequally as compared to other non-religious assemblies or institutions, by imposing draconian prohibitions on Calvary Chapel's sincerely held religious beliefs without a compelling government interest, and without deploying the least restrictive means to achieve any permissible government interest.

D. That the Court award Calvary Chapel nominal damages for the violation of Calvary Chapel's constitutional rights.

43

E.      That the Court adjudge, decree, and declare the rights and other legal relations within the subject matter here in controversy so that such declaration shall have the full force and effect of final judgment.

F.      That the Court retain jurisdiction over the matter for the purposes of enforcing the Court's order.

G.      That the Court declare Calvary Chapel is prevailing parties and award Calvary Chapel the reasonable costs and expenses of this action, including a reasonable attorney's fee, in accordance with 42 U.S.C. § 1988.

H.      That the Court grant such other and further relief as the Court deems equitable and just under the circumstances.

Respectfully submitted,


/s/ Charles W. Hodson            /s/ Daniel J. Schmid
Charles W. Hodson, II            Mathew D. Staver*
Charles W. Hodson, II Law Office Horatio G. Mihet*
P.O. Box 1006                    Roger K. Gannam*
Phone: (207) 945-3355            Daniel J. Schmid*
Facsimile: (207) 945-5104        LIBERTY COUNSEL
Email: cwh@hodsonlaw.com         P.O. Box 540774
                                 Orlando, FL 32854
                                 Phone: (407) 875-1776
                                 Facsimile: (407) 875-0770
                                 Email: court@lc.org
                                 hmihet@lc.org
                                 rgannam@lc.org
                                 dschmid@lc.org

                                 *Pro hac vice applications pending

                                 ***Attorneys for Calvary Chapel of Bangor***

## VERIFICATION

I, Kenneth Graves, am over the age of eighteen years and the Pastor of Calvary Chapel of Bangor, the Plaintiff in this action. The statements and allegations that pertain to me and/or Plaintiff Calvary Chapel of Bangor or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Maine, that the foregoing statements are true and correct to the best of my knowledge.

Dated: May 5, 2020

/s/ Kenneth Graves
Kenneth Graves