**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**
**Bangor Division**

| | |
|---|---|
| CALVARY CHAPEL OF BANGOR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. _____ |
| | ) |
| JANET MILLS, in her | ) |
| official capacity as Governor of the | ) |
| State of Maine, | ) |
| | ) |
| Defendant. | ) |

[R]estrictions inexplicably applied to one group and exempted from another do little to further these goals ["to lessen the spread of the virus or . . . protect the Commonwealth's citizens"] and do much to burden religious freedom. **Assuming all of the same precautions are taken**, why is it safe to wait in a car for a liquor store to open but dangerous to wait in a car to hear morning prayers? **Why can someone safely walk down a grocery store aisle but not a pew? And why can someone safely interact with a brave deliverywoman but not with a stoic minister? The Commonwealth has no good answers.[1]**

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION WITH INCORPORATED MEMORANUM OF LAW

Pursuant to Fed. R. Civ. P. 65 and L.R. 7, Plaintiff, CALVARY CHAPEL OF BANGOR ("Calvary Chapel" or the "Church"), moves this Court for a Temporary Restraining Order (TRO) and Preliminary Injunction (PI) against Defendant, JANET MILLS, in her official capacity as Governor of the State of Maine ("Governor Mills" or the "State"), as set forth below and in Calvary Chapel's contemporaneously filed Verified Complaint.

## URGENCIES JUSTIFIYING TEMPORARY RESTRAINING ORDER

In its Prayer for Relief in the Verified Complaint, Calvary Chapel seeks a TRO restraining and enjoining Governor Mills and her designees from unconstitutionally enforcing and applying

---

[1] *Maryville Baptist Church, Inc. v. Beshear*, -- F.3d --, 2020 WL 2111316, at *4 (6th Cir. May 2, 2020).

the various COVID-19 Executive Orders (collectively "GATHERING ORDERS") purporting to prohibit Calvary Chapel, on pain of criminal sanctions, from gathering for worship at Calvary Chapel, regardless of whether Calvary Chapel meets or exceeds the social distancing and hygiene guidelines pursuant to which the State disparately and discriminatorily allows so-called "essential" commercial and non-religious entities (*e.g.*, liquor stores, marijuana dispensaries, warehouse clubs, 'big box' and 'supercenter' stores) to accommodate gatherings of more than 10 people— indeed, with no numerical limit—without threat of criminal sanctions. As shown in the Verified Complaint, the GATHERING ORDERS have been interpreted, applied, and enforced, such that Maine State Police have threatened to impose criminal sanctions against religious gatherings, regardless of whether social distancing and personal hygiene recommendations are practiced.

At around the same time as the GATHERING ORDERS were being used to threaten criminal sanctions on Calvary Chapel, officials in other jurisdictions had similarly threatened to impose criminal sanctions on religious gatherings and have been enjoined by federal courts from enforcing such orders:

> (1) The Sixth Circuit Court of Appeals has issued an emergency injunction pending appeal prohibiting the Kentucky Governor from enforcing prohibitions on religious worship services. *See Maryville Baptist Church, Inc. v. Beshear*, -- F.3d --, 2020 WL 2111316 (6th Cir. May 2, 2020) [hereinafter *Maryville Baptist*]. In that appeal challenging orders similar to Governor Mills' orders here, the Sixth Circuit stated that "[t]he Governor's actions substantially burden the congregants' sincerely held religious practices—**and plainly so**." *Id.*, at \*2 (emphasis added). Additionally, **"[t]he way the orders treat comparable religious and non-religious activities suggests that they do not amount to the least restrictive way of regulating the churches."** *Id.*, at \*2 (emphasis added).

> (2) The Western District of Kentucky found that the mere threat of such criminal sanction warranted a TRO. *See On Fire Christian Center, Inc. v. Fischer*, No. 3:20-cv-264-JRW, 2020 WL 1820249 (W.D. Ky. Apr. 11, 2020) [hereinafter *On Fire*]. The *On Fire* TRO enjoined the Mayor of Louisville from "**enforcing, attempting to enforce, threatening to enforce, or otherwise requiring compliance with any prohibition on drive-in church services at On Fire.**" *Id.* at \*1 (emphasis added).

2

(3) The District of Kansas issued a TRO enjoining Kansas officials from enforcing its discriminatory prohibition on religious gatherings and required the government to treat "religious" worship services the same as other similar gatherings that are permitted. *See First Baptist Church. v. Kelly*, No. 20-1102-JWB, 2020 WL 1910021, *6–7 (D. Kan. Apr. 18, 2020)[hereinafter *First Baptist*]. The *First Baptist* TRO specifically stated that the government's disparate treatment of religious gatherings was a violation of the Free Exercise Clause because it showed that "**religious activities were specifically targeted for more onerous restrictions than comparable secular activities**," and that the churches had shown irreparable harm because they would "be prevented from gathering for worship at their churches" during the pendency of the executive order. *Id.* at *7–8 (emphasis added). Thus, the court enjoined Kansas from enforcing the gathering bans.

Here, Governor Mills and Maine State Police have similarly threatened Calvary Chapel with criminal sanctions for hosting in-person religious gatherings. Additionally, the Maine State Police—acting under the direction of Governor Mills' orders—has publicly declared that it would enforce the Governor's orders and has threatened to impose criminal sanctions on those found in violation of them. **Absent emergency relief from this Court, Calvary Chapel, its pastor, and all congregants will suffer irreparable injury from the threat of criminal prosecution for the mere act of engaging in the exercise of religion**.

Calvary Chapel prays unto this Court to issue a TRO enjoining Governor Mills from similarly **enforcing, attempting to enforce, threatening to enforce, or otherwise requiring compliance with any prohibition on religious gatherings**. Calvary Chapel does not seek, at this emergent stage, to undermine the entirety of Governor Mills' efforts to prevent the spread of COVID-19 in the State. **Calvary Chapel merely seeks to be free from the unconstitutionally unequal application of the GATHERING ORDERS in such a way that the Church and its pastor and congregants are threatened with criminal sanctions for simply having a church service.** Absent emergency relief from this Court, Governor Mills will continue to threaten Calvary Chapel with criminal sanctions, **including this Sunday**, by targeting Calvary Chapel's religious gatherings for discriminatory treatment.

3

## MEMORANDUM OF LAW IN SUPPORT

To obtain a TRO or PI, Calvary Chapel must demonstrate it has a strong likelihood of success on the merits, that it will suffer irreparable injury absent the order, that the balance of the equities favors the order, and that the public interest is served by the Court's issuing the order. *See Bl(a)ck Tea Soc'y v. Boston*, 378 F.3d 8, 11 (1st Cir. 2004); *Bourgoin v. Sebelius*, 928 F. Supp. 2d 258, 267 (D. Me. 2013) ("The standard for granting a temporary restraining order is the same as for a preliminary injunction."). Calvary Chapel easily satisfies each of these elements factually and legally. (Calvary Chapel hereby incorporates by reference the allegations of its Verified Complaint, filed contemporaneously herewith, as its statement of facts in support of this motion.)

## I.   CALVARY CHAPEL IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM THAT GATHERING ORDERS ARE UNCONSTITUTIONAL.

### A.   The GATHERING ORDERS Violate Calvary Chapel's First Amendment Rights to Free Exercise of Religion and Should Be Restrained.

Though the State might not view church attendance as fundamental to the religious beliefs of Calvary Chapel, its opinion is irrelevant to the protections afforded to Calvary Chapel's sincerely held religious beliefs. Calvary Chapel's "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merits First Amendment protection." *Thomas v. Rev. Bd. of Ind. Emp. Security Div.*, 450 U.S. 707, 714 (1981). Indeed, "[a]t a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or **regulates or prohibits conduct because it is undertaken for religious reasons**." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) (emphasis added). "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Id.* at 543. Prohibiting Calvary Chapel from hosting, and its members from attending, religious services where other non-religious

4

gatherings are permitted under similar circumstances "**violat[es] the Free Exercise Clause beyond all question**." *On Fire*, 2020 WL 1820249, at \*6 (emphasis added). Even in a time of crisis or disease, *see Jacobson v. Massachusetts*, 197 U.S. 11 (1905), the First Amendment does not evaporate. Indeed, "even under *Jacobson*, constitutional rights still exist. Among them is the freedom to worship as we choose." *On Fire*, 2020 WL 1820249, at \*8; *see also Terminiello v. City of Chicago*, 337 U.S. 1, 27, 31, 38 (1949).

The GATHERING ORDERS plainly impose significant burdens on Calvary Chapel's religious beliefs. Indeed, "[o]rders prohibiting religious gatherings, enforced by police officers telling congregants they violated a criminal law . . . amount to a significant burden on worship gatherings," "**and plainly so**." *Maryville Baptist*, 2020 WL 2111316, at \*2 (emphasis added).

### 1. Burdens on sincerely held religious beliefs are subject to strict scrutiny if neither neutral nor generally applicable.

"[A] law that is neutral and of general applicability need not be justified by a compelling government interest even if the law has the incidental effect of burdening a particular religious practice." *Lukumi*, 508 U.S. at 531. But, as here, "[a] law failing these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest," *id.* at 532, and "will survive strict scrutiny only in rare cases." *Id.* at 546. The GATHERING ORDERS plainly fail this test.

### 2. The GATHERING ORDERS are neither neutral nor generally applicable.

#### a. The GATHERING ORDERS are not neutral.

"Although a law targeting religious beliefs as such is never permissible . . . if the object of the law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Lukumi*, 508 U.S. at 533. To determine neutrality, courts look to the text of the law "for the minimum requirement of neutrality is that a law not discriminate on its face." *Id.* But, "[f]acial

neutrality is not determinative. The Free Exercise Clause extends beyond facial discrimination [and] forbids subtle departures from neutrality." *Id.* at 534. This is so because, as here, "[o]fficial action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with facial neutrality." *Id.* For the First Amendment prohibits hostility that is "masked, as well as overt." *Id.* The GATHERING ORDERS are not facially neutral, and even if they were, they represent subtle departures from neutrality by treating Calvary Chapel's religious gatherings of more than 10 individuals differently than similar non-religious gatherings. In fact, as the Sixth Circuit just held, "**general bans that cover religious activity when there are exceptions for comparable secular activities**" **fail the test of neutrality and represent** "**several potential hallmarks of discrimination.**" *Maryville Baptist*, 2020 WL 2111316, at *3 (emphasis added).

The GATHERING ORDERS fail even cursory facial examination. They expressly target "religious" or "faith-based" gatherings for disparate treatment. (V.Compl. ¶ 26, EXS. B, C.) Yet, in the very same text of the GATHERING ORDERS, businesses such as liquor stores, warehouse clubs, supercenter stores, marijuana dispensaries, and even "non-essential" stores are exempted from the broad prohibitions. (V.Compl. ¶¶ 28, 38, EX. E.) When the government "has targeted religious worship" for disparate treatment—such as attending religious worship services—while "not prohibit[ing] parking in parking lots more broadly—including, again, the parking lots of liquor stores," it is not neutral. *On Fire*, 2020 WL 1820249, at *6. Furthermore, here, as in *First Baptist*, the "orders begin with a broad prohibition against mass gatherings [but] proceed to carve out broad exemptions for a host of secular activities, **many of which bear similarities to the sort of personal contact that will occur during in-person religious services**." 2020 WL 1910021, at *5 (emphasis added). In *Maryville Baptist*, too, the Sixth Circuit stated that such a system of exemptions for all gatherings but religious gatherings fails the neutrality test because "restrictions

inexplicably applied to one group and exempted from another do little to further these goals and do much to burden religious freedom." 2020 WL 2111316 at *4. Governor Mills expressly targeted churches, threatening criminal prosecution. At the same time, no similar action is directed towards people in liquor stores, in Walmart, **in marijuana dispensaries**, or even in "non-essential" business. The GATHERING ORDERS are not neutral.

> **b.   The GATHERING ORDERS are not generally applicable.**

In determining general applicability, the courts focus on disparate treatment of similar conduct. *See Lukumi*, 508 U.S. at 542. "All laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice." *Id.* The textbook operation of a law that is not generally applicable is one where "inequality results" from the government's "decid[ing] that the governmental interests it seeks to advance are worthy of being pursued **only against conduct with religious motivation**." *Id.* at 543 (emphasis added). In *Lukumi*, the Supreme Court held that a law "fall[s] well below the minimum standard necessary to protect First Amendment rights" when the government "**fail[s] to prohibit nonreligious conduct that endangers these interests in a similar or greater degree**" than the prohibited religious conduct. *Id.* (emphasis added).

This is precisely the effect of the GATHERING ORDERS. First, they purport to prohibit all "gatherings of more than 10 people," but then exclude large crowds and masses of people gathered at numerous businesses and other non-religious entities. (V.Compl. ¶¶ 27–38, EXS. B–D.) Their text makes it plain that "faith-based" gatherings of more than 10 individuals are prohibited, but large numbers of people may gather at liquor stores, casinos, warehouse and supercenter stores, shopping malls, and marijuana dispensaries as but a few examples. (*Id.*) Moreover, non-retail businesses may accommodate large gatherings of employees and customers during all hours if they observe distancing and hygiene recommendations. (*Id.*) Furthermore, non-

religious **gatherings at "non-essential" retail businesses are permitted** for employees and non-customer persons if distancing and hygiene guidelines are. (*Id.*) But "religious" gatherings of 11 people are still prohibited, no matter how large the facility or how long the gathering lasts, even if social distancing, enhanced sanitizing, and personal hygiene guidelines are followed religiously. If large gatherings at liquor, warehouse, and supercenter stores, marijuana dispensaries, casinos, and even "non-essential" retail businesses are not prohibited—and distancing and hygiene practices are only required "to maximum extent practicable"—even though endangering citizens (or not) to an equal degree, then it is obvious "religious" gatherings have been targeted for discriminatory treatment. Such a blatant discriminatory application of the GATHERING ORDERS "falls well below the minimum standard" the First Amendment demands. *Lukumi*, 508 U.S. at 543; *see also On Fire*, 2020 WL 1820249, at *6 (holding that government regulation is not generally applicable when it targets religious gatherings with "orders and threats" but does not apply the same orders and threats to similar non-religious conduct). As *Maryville Baptist* held,

> Assuming all of the same precautions are taken, why is it safe to wait in a car for a liquor store to open but dangerous to wait in a car to hear morning prayers? **Why can someone safely walk down a grocery store aisle but not a pew**? Any why can someone safely interact with a brave deliverywoman but not with a stoic minister? The Commonwealth has no good answers.

2020 WL 2111316, *4. The GATHERING ORDERS are not generally applicable.

**B.      The GATHERING ORDERS Violate the Establishment Clause.**

"**If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein**." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (emphasis added). Where, as here, Calvary Chapel seeks to be free from disparate treatment by the State, the very core of the Establishment Clause is at issue. "An attack founded on disparate treatment of "religious" claims invokes what

8

is perhaps the central purpose of the Establishment Clause—**the purpose of ensuring governmental neutrality in matters of religion**." *Gillette v. United States*, 401 U.S. 437, 449 (1971) (emphasis added). Indeed, the Establishment Clause "affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility towards any." *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984). That mandate of preventing hostility towards religions is equally present in times of exigent circumstances, such as COVID-19. For, as "[a]n instrument of social peace, **the Establishment Clause does not become less so when social rancor runs exceptionally high**." *Lund v. Rowan Cnty.*, 863 F.3d 268, 275 (4th Cir. 2017) (emphasis added).

But, the principle of neutrality requires that this Court analyze whether the government's motive in applying disparate treatment to religious gatherings, as opposed to similar non-religious gatherings, is not merely a pretext or a sham. *See, e.g.*, *McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 864 (2005) (holding that the government's motive for its actions "has to be genuine, not a sham"). In determining whether the government's motive represents a sham, courts often look to the progression of the government's actions. *See id.* at 866 (declining to accept the government's proposition that "the last in a series of government actions" is determinative for whether its actions offend the Establishment Clause). Here, the progression of the State's actions demonstrate that religious gatherings were "targeted for stricter treatment due to the nature of the activity involved, rather than because such gatherings pose unique health risks that mass gatherings at commercial and other facilities do not," and "the disparity has been imposed without any apparent explanation for the differing treatment of religious gatherings." *First Baptist*, 2020 WL 1910021, at *7.

Indeed, the State started with the general position that all "gatherings of more than 10 people" were prohibited, including "faith-based" gatherings. (V.Compl. ¶ 26, EX. B.) But, in the next breath, the State opened a broad category of exemptions for "grocery and household goods,"

"home repair and hardware stores," and "big box" stores to continue operations as being deemed "essential." (V.Compl. ¶ 28.) On March 24, the State clarified its initial gathering prohibition, making it explicitly clear that "faith-based" gatherings were still prohibited but that similarly situated "essential" and "non-essential" businesses could continue accommodating crowds and masses if social distancing and hygiene practices were followed. (V.Compl. ¶¶ 27–31, EX. C.) Then, on April 2, the State made it abundantly clear that it would enforce Governor Mills' GATHERING ORDERS against churches and religious gatherings by having the State Police release an Enforcement Memorandum threatening criminal penalties and sanctions for violation of the GATHERING ORDERS. (V.Compl. ¶ 51, EX. I.)

Perhaps sensing that arresting pastors, imposing criminal sanctions on them, and hailing them into judicial tribunals for the act of hosting worship was problematic, Governor Mills has released speculative, future plans permitting churches to potentially begin opening in May, if she deems health criteria sufficient in the state. (V. Compl. ¶48, EX. H.). That document reiterates that churches may only have gatherings (*i.e.*, worship services) if they abide by the Governor's 10-person limit, and then "benevolently" informs Calvary Chapel that it may conduct worship services approved by the government—such as "drive-in, stay-in-your-vehicle church services"—so long as no one actually assembles together in person. (*Id.*)

The progression of the State's actions was a sham at the start and remains unconstitutional even after its "benevolent" instructions for 'proper' worship during COVID-19. Its purpose in treating religious gatherings differently from the start was a sham because there is no evidence that religious gatherings "pose unique health risks that mass gatherings at commercial and other facilities do not," *First Baptist*, 2020 WL 1910021, at *7, or "because the risks at religious gatherings uniquely cannot be adequately mitigated with safety protocols" such as those at liquor

stores or other "essential" stores that may continue to operate without numerical limitation or scrutiny. *Id.* Indeed, as the Sixth Circuit stated, "We doubt the reason a group of people go to one place has anything to do with it. Risks of contagion turn on social interaction in close quarters; **the virus does not care why they are there**." *Maryville Baptist*, 2020 WL 2111316, *4 (emphasis added). Thus, treating Calvary Chapel and other religious gatherings differently was a sham from the start and remains constitutionally infirm even now. **Indeed, the government does not have the authority to, with the stroke of a pen, declare churches and attendance at church to be "non-essential" and impose criminal sanctions on Calvary Chapel for failing to abide by that government-imposed prescription of orthodoxy.** The Constitution demands more.

C.   **The GATHERING ORDERS Restrict Calvary Chapel's First Amendment Rights to Speech and Assembly and Should Be Restrained.**

1.   **The GATHERING ORDERS discriminate against Calvary Chapel's speech rights and rights to assemble on the basis of content.**

"Content-based laws—those that target speech on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling government interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both distinctions are drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.* S. Ct. at 2227 (emphasis added). Put simply, the Supreme Court handed down a firm rule: **laws that are content based on their face must satisfy strict scrutiny**. *Id.* Importantly, this firm rule mandating strict scrutiny of facially content-based restrictions of speech applies regardless of the government's alleged purpose in enacting the law, even if the alleged purpose arises from a time of purported emergency. *See id.* ("On its face, the [law] is a content-based regulation of speech. **We thus have no need to consider the**

11

**government's justifications or purposes for enacting the [law] to determine whether it is subject to strict scrutiny**.") "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Id.*

This Court need look no further than the text of the GATHERING ORDERS to determine that they are content-based restrictions on constitutionally protected liberties. The GATHERING ORDERS purport to prohibit "all gatherings of more than 10 people," except a gathering of more than 10 people is permissible without scrutiny or threat of sanction at many retail businesses deemed "essential," and at many more professional and retail businesses deemed "non-essential," none of which are required to observe distancing and hygiene guideless except "to maximum extent practicable."  (V.Compl. ¶¶ 27–32, EXS. B, C, D.) **Thus, the State found numerous categories of businesses for which large numbers of people may gather without restraint, but expressly prohibited the constitutionally protected assemblies or "gatherings" of "faith-based" groups**. Yet, the State has targeted Calvary Chapel's "faith-based" gatherings, prohibited Calvary Chapel from engaging in such gatherings and threatened to continue imposing such criminal sanctions for engaging in such "faith-based" gatherings. But the State has created carveouts for gatherings of more than 10 individuals at liquor, warehouse, and supercenter stores, marijuana dispensaries, casinos, and countless other "non-essential" businesses. (V.Compl. ¶¶ 27–32, EXS. B, C, D.) That is a textbook content-based restriction on Calvary Chapel's speech. It must therefore satisfy strict scrutiny, which it cannot do. (*See infra* section I.E.)

###### D.      The GATHERING ORDERS Cannot Withstand Strict Scrutiny.

Because the GATHERING ORDERS substantially burden Calvary Chapel's sincerely held religious beliefs, are neither neutral nor generally applicable, and are a content-based restriction

on Calvary Chapel's speech and assembly rights (*see supra* sections I.A–C), they must survive strict scrutiny. The State is therefore subject to "the most demanding test known to constitutional law." *Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2017) (quoting *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997)). In fact, "**it is the rare case in which a . . . restriction withstands strict scrutiny**." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2236 (Kagan, J., concurring) (quoting *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015)) (emphasis added). Indeed, "**strict-scrutiny review is strict in theory but usually fatal in fact**." *Bernal v. Fainter*, 467 U.S. 216, 219 n.6 (1984) (emphasis added). This is not that rare case, and strict scrutiny here condemns the GATHERING ORDERS to the appropriate constitutional grave.

> 1.    **The State's unconstitutional application of the GATHERING ORDERS and discriminatory treatment of "religious" gatherings is not supported by a compelling interest.**

When "[a] speech-restrictive law with widespread impact" is at issue, "**the government must shoulder a correspondingly heavier burden and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights**." *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2472 (2018) (emphasis added). Here, because the GATHERING ORDERS infringe upon Calvary Chapel's free speech rights, the government "must do more than simply posit the existence of the disease sought to be cured. **It must demonstrate that the recited harms are real, not merely conjectural**." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994); *see also Edenfield v. Fane*, 507 U.S. 761, 770 (1993). This is so because "[d]eference to [the government] cannot limit judicial inquiry when First Amendment rights are at stake." *Landmark Commc'ns, Inc. v. Maine*, 435 U.S. 829, 843 (1978).

To be sure, efforts to contain the spread of a deadly disease are "compelling interests of the highest order." *On Fire*, 2020 WL 1820249, at *7. Calvary Chapel does not doubt the sincerity

of the State's assertion of such an interest. But where the State permits regular gatherings of more than 10 persons for commercial, non-religious, and even so-called "non-essential" reasons, while expressly prohibiting Calvary Chapel's "faith-based" gatherings of like kind, the government's assertions of a compelling interest are substantially diminished. Put simply, the GATHERING ORDERS "cannot be regarded as protecting an interest of the highest order . . . **when [they] leave[] appreciable damage to that supposedly vital interest unprohibited**." *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002) (emphasis added). Indeed, where the government creates a host of exceptions, such as Governor Mills' orders here (V. Compl. ¶¶ 27–32), the Supreme Court has recognized that such exceptions "can raise 'doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker.'" *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 448 (2015) (quoting *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786 (2011)). The State cannot permit broad swaths of gatherings, carrying the same (if not greater) risk than that posed by Calvary Chapel's church services, and still claim constitutional compliance. "Such a prohibition does not protect an interest of the highest order." *Id.*

   2.   **The State cannot satisfy its burden of proving narrow tailoring because the GATHERING ORDERS are not the least restrictive means.**

Calvary Chapel "**must be deemed likely to prevail unless the government has shown that [Calvary Chapel's] proposed less restrictive alternatives are less effective than enforcing the act**." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) (emphasis added). Indeed, to prove narrow tailoring, the State is required to demonstrate that there are no less restrictive means capable of achieving its desired result. *See, e.g.*, *Boos v. Berry*, 485 U.S. 312, 329 (1988) (when content-based restrictions on speech are analyzed under strict scrutiny, an ordinance "is not narrowly tailored [where] a less restrictive alternative is readily available"); *Ward v. Rock Against Racism*, 491 U.S. 781, 798 n.6 (1989) (noting that under "the most exacting scrutiny" applicable to content-based

restrictions on speech, the government must employ the least restrictive alternative to pass narrow tailoring). The State bears the burden of demonstrating narrow tailoring as a matter of law, and that is a burden it simply cannot satisfy here. Less restrictive means are available, and that alone condemns the State's application of the GATHERING ORDERS to failure under strict scrutiny.

a.    **The State bears the burden of demonstrating narrow tailoring and least restrictive means.**

Even on a motion for TRO or PI, the State unquestionably bears the burden of demonstrating that the GATHERING ORDERS are narrowly tailored. As the Supreme Court has held: "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). As such, **the government—**not the movant—bears the burden of proof on narrow tailoring, because **the government** bears that burden at trial. *See Ashcroft*, 542 U.S. at 665 (on preliminary injunction motion, "**the burden is on the government** to prove that the proposed alternatives will not be as effective as the challenged statute." (emphasis added)).

The State indisputably bears the burden of proving narrow tailoring at trial. *See, e.g.*, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *id.* at 2540 ("To meet the requirement of narrow tailoring, **the government must demonstrate** that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." (emphasis added)). Thus, the State also bears—and falls woefully short of meeting—the burden of proving narrow tailoring here. *See Gonzales*, 546 U.S. at 429; *Ashcroft*, 542 U.S. at 665.

**b.**      **The State cannot demonstrate that it seriously considered less restrictive alternatives and ruled them out for good reason.**

The State flunks the narrow tailoring strict scrutiny test for a simple reason. In connection with its narrow tailoring burden, the State must show that it "**seriously** undertook to address the problem with less intrusive tools readily available to it," meaning that it "**considered different methods that other jurisdictions have found effective**." *McCullen v. Coakley*, 134 S. Ct. 2518, 2539 (2014) (emphasis added). "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* at 2540. Thus, the State "would have to show either that **substantially less-restrictive alternatives were tried and failed**, or that the **alternatives were closely examined and ruled out for good reason**." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 370 (3d Cir. 2016) (emphasis added).

The State utterly fails this test. The State tried nothing else. It considered nothing else but a complete prohibition. The State jumped straight to a purported ban on "all gatherings of more than 10 people," and proclaimed that "faith-based" gatherings were included among the prohibition. (V.Compl. ¶ 26, EX. B.) But the State drove a Mack Truck through its prohibition by expansively exempting numerous businesses and non-religious entities, such as liquor, warehouse, and supercenter stores, marijuana dispensaries, and so-called "non-essential" stores. (V.Compl. ¶¶ 27–38.) The State has not and cannot state why or how gathering with a large number of persons at a warehouse or supercenter store (*i.e.*, browsing, shopping, coughing, sneezing, and touching surfaces, all while moving in the midst of crowds and masses that turn over by the hundreds throughout a day, with distancing and hygiene practiced only "to maximum extent practicable") is any less "dangerous" to public health than attending a time-limited worship service, where distancing and hygiene are strictly observed, in a space used for no more than a few hours twice

16

per week. Yet the State exempted the non-religious gatherings and prohibited Calvary Chapel's church services. Quite simply, the State imposed a draconian religious gathering prohibition "not reasonably restricted to the evil with which it is said to deal." *Butler v. Michigan*, 352 U.S. 380, 383 (1957). The State tried nothing else, and for that reason alone fails narrow tailoring.

<blockquote>

**c.**   **The numerous other COVID-19 orders specifically exempting religious gatherings or treating them equally to non-religious gatherings demonstrates less restrictive alternatives exist.**

</blockquote>

Even if the State could substantiate compelling interests for the GATHERING ORDERS' discriminatory treatment of religious gatherings, which it cannot, the State could not meet its burden of showing that the GATHERING ORDERS are narrowly tailored. "It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). There must be a 'fit between the . . . ends and the means chosen to accomplish those ends.'" *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 572 (2011).

The Supreme Court has clearly established that "[t]he government may not regulate ['a mode of speech'] based on hostility—or favoritism—towards the underlying message expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992) (internal quotation marks omitted). The GATHERING ORDERS impose discriminatory treatment on "faith-based" gatherings that are not applied to similar or larger non-religious gatherings. "The existence of adequate content-neutral alternatives thus undercut significantly any defense of such a statute, casting considerable doubt on the government's protestations that the asserted justification is in fact an accurate description of the purpose and effect of the law." *Id.* at 395 (internal quotation marks and citation omitted)).

As shown in the Verified Complaint, the State has ignored numerous other, less restrictive means of achieving its purported interest. One option tried successfully in other jurisdictions is to exempt religious gatherings from gathering prohibitions altogether. The States of Arizona, Florida,

Indiana, Ohio, and Texas have declared religious gatherings essential activities which may continue, instead of declaring such constitutionally protected activities "non-essential" with a stroke of a pen. (V.Compl. ¶¶ 65, 66, 67, 71, 72, EXS. J, K, L, M, Q, R.) The State has refused to consider or attempt it. Another less restrictive alternative would be to allow churches to continue in-person services provided they agree to maintain adequate social distancing, enhanced sanitizing, and personal hygiene practices, like those allowed at other non-religious gatherings of more than ten individuals. Alabama, Arkansas, and Connecticut, have all permitted such an exception for religious gatherings. (V.Compl. ¶¶ 68–70, EXS. N–P.) Calvary Chapel has demonstrated it already engages in the recommended social distancing, enhanced sanitizing, and personal hygiene practices recognized by the State as sufficient for non-religious gatherings (V.Compl. ¶¶ 55-56.) Nothing justifies depriving Calvary Chapel of the benefits afforded to non-religious gatherings.

Indeed, as the court in *On Fire* already exquisitely stated, the State is unlikely to be able to demonstrate that it deployed the least restrictive means because the GATHERING ORDERS

> are **"underinclusive"** *and* **"overbroad."** They're underinclusive because they don't prohibit a host of equally dangerous (or equally harmless) activities that the State has permitted . . . . Those . . . activities include driving through a liquor store's pick-up window, parking in a liquor store's parking lot, or walking into a liquor store where other customers are shopping. . . But if beer is "essential," **so is [church]**.

2020 WL 1820249, at *7 (emphasis added) (footnote omitted). Further, as *First Baptist* held, "where comparable secular gatherings are subjected to much less restrictive conditions" than "the broad prohibition against in-person religious services," the government is not likely to meet its burden that it deployed the least restrictive means. 2020 WL 1910021, at *8.

Put simply, the State's failure to try other available alternatives that have worked and are working in other jurisdictions demonstrates that it cannot satisfy its burden to demonstrate that its actions are narrowly tailored. It thus fails strict scrutiny, and the TRO and PI are warranted.

## II.   CALVARY CHAPEL IS SUFFERING AND WILL CONTINUE TO SUFFER IRREPARABLE INJURY ABSENT A TRO AND PRELIMINARY INJUNCTION.

Governments are not empowered to create "First Amendment Free Zones" within their borders, like the State has done here. *See, e.g.*, *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) (striking local government's attempt to prohibit protected expression within a "First Amendment Free Zone."); *United States v. Stevens*, 559 U.S. 460, 470 (2010) (government in not empowered to create First Amendment free zones with respect to certain categories of speech). Saying that Calvary Chapel may avoid irreparable injury by simply "watching church services online" or doing "drive-through" or "drive-in" services while foregoing established constitutional rights is simply insufficient under the First Amendment. Indeed, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). *See also* 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane*, Federal Practice & Procedure* §2948.1 (2d ed. 1995) ("When an alleged constitutional right is involved, most courts hold that **no further showing of irreparable injury is necessary**." (emphasis added)). Where, as here, Calvary Chapel has made a sufficient showing of likely success on the merits, "irreparable injury is presumed." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 11 (1st Cir. 2012). Thus, demonstrating irreparable injury "**is not difficult. Protecting religious freedom was a vital part of our nation's founding, and it remains crucial today**." *On Fire*, 2020 WL 1820249, at *9 (emphasis added).

## III.   THE REMAINING FACTORS FAVOR A TPO AND PRELIMINARY INJUNCTION.

An injunction in this matter will protect the very rights the Supreme Court has characterized as "lying at the foundation of a free government of free men." *Schneider v. New Jersey*, 308 U.S. 147, 151 (1939). The granting of a TRO and PI enjoining enforcement of the

GATHERING ORDERS on Calvary Chapel's worship services will impose no harm on the State. Indeed, the State "is in no way harmed by the issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club v. Miller*, 637 F.3 291, 302–03 (4th Cir. 2011). But for Calvary Chapel, as noted above, even minimal infringements upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief. *Id.* As such, there is no comparison between the irreparable loss of First Amendment freedoms suffered by Calvary Chapel absent a TRO and the non-existent interest the State has in enforcing unconstitutional GATHERING ORDERS. Absent a TRO, Calvary Chapel and its members "face an impossible choice: skip [church] service[s] in violation of their sincere religious beliefs, or risk arrest, mandatory quarantine, or some other enforcement action for practicing those sincere religious beliefs." *On Fire*, 2020 WL 1820249, at *9. The balance favors injunctive relief.

Finally, "[i]njunctions protecting First Amendment freedoms are **always in the public interest**." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012) (emphasis added). This protection is *ipso facto* in the interest of the general public because "First Amendment rights are not private rights [but] rights of the general public [for] the benefits of all of us." *Machesky v. Bizzell*, 414 F.2d 283, 288–90 (5th Cir. 1969) (citing *Time, Inc. v. Hill*, 385 U.S. 374 (1967)). There is no "evidence that churches are less essential than every other business that is currently allowed to be open," *On Fire*, 2020 WL 1820249, at *9, and "**the public has a profound interest in men and women of faith worshipping together [in church] in a manner consistent with their conscience**." *Id.* (emphasis added).

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court issue the TRO and PI as set forth in the Prayer for Relief in Plaintiffs' Verified Complaint (V.Compl. at 45–49.)

Respectfully submitted,

/s/ Charles W. Hodson

Charles W. Hodson, II
Charles W. Hodson, II Law Office
P.O. Box 1006
Phone: (207) 945-3355
Facsimile: (207) 945-5104
Email: cwh@hodsonlaw.com

/s/ Daniel J. Schmid

Mathew D. Staver*
Horatio G. Mihet*
Roger K. Gannam*
Daniel J. Schmid*
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
Facsimile: (407) 875-0770
Email: court@lc.org
hmihet@lc.org
rgannam@lc.org
dschmid@lc.org

*Pro hac vice applications pending

***Attorneys for Calvary Chapel of Bangor***