# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| CALVARY CHAPEL OF BANGOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 1:20-cv-00156-NT |
| | ) | |
| JANET MILLS, Governor of the State of Maine, | ) ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON PLAINTIFF'S MOTION

## FOR A TEMPORARY RESTRAINING ORDER

On Tuesday, May 5, 2020, at 9:37 p.m., Plaintiff Calvary Chapel of Bangor filed a ten-count Complaint against Janet Mills, Governor of Maine ("**Governor Mills**"), alleging that the Governor's orders issued in response to COVID-19, which limit the size of gatherings to ten people, violate Calvary Chapel's constitutional and statutory rights. Before the Court is the Plaintiff's Motion for Temporary Restraining Order, which seeks emergency relief before Sunday, May 10, 2020. Motion for Temporary Restraining Order and Preliminary Injunction ("**Pl.'s Mot.**") (ECF No. 3).

I held a brief conference with Plaintiff's counsel on Wednesday, May 6, 2020, because the Plaintiff asserted in its complaint that Calvary Chapel's attempts to secure relief from the State without judicial intervention had been ignored[1] and

---

[1]     The Plaintiff's attempts to secure relief from the State turned out to be a letter sent via email to the Governor and her counsel at 8:30 p.m. on May 4, 2020, giving the Governor until 1:00 p.m. the next day, May 5, 2020, to notify Calvary Chapel that she had rescinded her Executive Order limiting gatherings to ten people. Demand Letter (ECF No. 1-19)

attempts to notify the State would be futile before Sunday. Compl. ¶¶ 83–85 (ECF No. 1). I advised Plaintiff's counsel that service on the Governor would not be as difficult as the Plaintiff asserted, and, at my urging, the Plaintiff was able to effect service in time for a joint telephone conference at 9:00 a.m. the next day, Thursday, May 7, 2020. The Governor agreed to provide an expedited response, which was submitted at 5:00 p.m. on Friday, May 8, 2020.[2] (ECF No. 23.) After considering the motion, the exhibits filed in support thereof, and the opposition to the motion filed by the Governor, I **DENY** the Plaintiff's Motion for Temporary Restraining Order.

## BACKGROUND

### I.    The COVID-19 Pandemic

The 2019 Novel Coronavirus ("**COVID-19**") is a respiratory illness caused by a coronavirus, known as SARS-CoV-2. Decl. of Nirav Dinesh Shah, M.D., J.D.[3] ¶ 9 ("**Shah Decl.**") (ECF No. 20). An outbreak of COVID-19 was first identified in January of 2020 in Wuhan City, China, and it has since swept the globe. Shah Decl. ¶¶ 9, 11. As of May 7, 2020, COVID-19 has infected millions worldwide and killed 75,543 people in the United States alone. Shah Decl. ¶ 11.[4] On January 31, 2020, the

---

[2]     Around the same time that the State's opposition was filed, the Americans United for Separation of Church and State submitted a motion for leave to file an amicus brief with an accompanying brief. (ECF Nos. 22 & 24.) Because of the tight timelines, and because the Plaintiff has not had time to file any opposition to the amicus motion, I have not considered the amicus brief.

[3]     Dr. Shah is the Director of the Maine Center for Disease Control and Prevention. Shah Decl. ¶ 1 (ECF No. 20).

[4]     *See also* World Health Organization, Coronavirus Disease 2019 Situation Report, May 6, 2020 https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200508covid-19-sitrep-109.pdf?sfvrsn=159c3dc_2 (last visited May 9, 2020).

United States Department of Health and Human Services determined that, as of January 27, 2020, the COVID-19 virus constituted a nationwide public health emergency. Shah Decl. ¶ 10. On March 11, 2020, the World Health Organization declared a global pandemic. Shah Decl. ¶ 10. On March 13, 2020, President Donald Trump declared a National Emergency.[5]

Although not everything is yet known about COVID-19, it appears to spread several ways, including: (1) through respiratory droplets produced when an infected person coughs, sneezes, or talks; (2) through close personal contact, such as touching or shaking hands; and (3) through touching an object or surface containing the virus and then touching one's mouth, nose, or eyes. Shah Decl. ¶ 13. It is known that the virus can travel up to six feet through the air, and that it can live on surfaces, such as cardboard, for up to 24 hours. Shah Decl. ¶ 14. What makes the COVID-19 virus so nefarious is its long incubation period. Shah Decl. ¶ 15. For up to 14 days, a person can be infected and spreading the virus without noticing any symptoms. Shah Decl. ¶ 15. There is currently neither a vaccine for COVID-19 nor any effective pharmaceutical treatment, and it will take considerable time—perhaps over a year— for a vaccine or treatment to be developed and widely distributed. Shah Decl. ¶ 18.

In the absence of a vaccine or other treatment, the most effective way to control the virus is to practice "social distancing," also referred to as "physical distancing." Shah Decl. ¶ 19. Both the federal and Maine Centers for Disease Control ("**U.S. CDC**

---

[5]     President Trump made the National Emergency retroactive to March 1, 2020. To date, all fifty states and the District of Columbia have declared emergencies.

**and Maine CDC**") have determined that, to slow the spread of this virus, it is important to avoid gatherings of people and to keep at least six feet away from others. Shah Decl. ¶ 20. *See also* U.S. CDC, How to Protect Yourself & Others, www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited May 9, 2020).

## II.    Maine's Response

Governor Mills declared a "state of emergency" in Maine on March 15, 2020. Proclamation of State of Civil Emergency to Further Protect Public Health ("**Emergency Proclamation**") (ECF No. 1-1). In that Emergency Proclamation, Governor Mills stated that COVID-19 "poses an imminent threat of substantial harm to our citizens" and directed various state agencies to implement certain restrictions and orders to facilitate the State's response. Emergency Proclamation at 1. Over the last two months, Governor Mills has issued numerous executive orders addressing the COVID-19 health crisis. The orders at issue in this case, which I refer to collectively as the "Gathering Orders," impose restrictions on assembly.

First, on March 18, 2020, Governor Mills issued Executive Order 14 stating that "[g]atherings of more than 10 people are prohibited throughout the State," and declared that such a prohibition was mainly aimed at "social, personal, and discretionary events," including those gatherings that are "faith-based."[6] Executive Order 14 at 1 (ECF No. 1-2).

---

[6]      Governor Mills's Order is consistent with the recommendations of President Trump and the U.S. CDC that all people avoid social gatherings of more than ten people; work and attend school from home whenever possible; avoid eating or drinking at bars, restaurants, and food courts; avoid discretionary travel, shopping, or social visits; and practice good hygiene. The federal guidance advises

Then, on March 24, 2020, Governor Mills issued Executive Order 19. (ECF No. 1-3.) This Order continued the prohibition of all gatherings of more than ten people but carved out an exemption for businesses deemed "essential." Businesses deemed "essential" are permitted to continue operations subject to the requirement that they adhere to social distancing guidelines—maintaining a six-foot distance between individuals—and other "social distancing requirements." Under the Order, essential businesses include "grocery and household goods" stores, "gas stations," and "home repair, hardware and auto repair" stores. Executive Order 19 at 2.

Executive Order 19 ordered "non-essential" businesses to cease activities at public-facing sites, but it permitted them to conduct limited activities that "do not allow customer, vendor or other visitor in-person contact;" "do not require more than 10 workers to convene in space where social distancing is not possible;" and "are facilitated to the maximum extent practicable by employees working remotely." Non-essential businesses may engage in activities such as taking remote orders, maintaining the value of inventory, and processing payroll. These non-essential businesses include "shopping malls, theaters, casinos, fitness and exercise gyms . . ., and similar personal care and treatment facilities." Executive Order 19 at 3. Executive Order 19 may be enforced through Maine departments or officials that issue business licenses. Executive Order 19 at 4.

---

governors of states with evidence of community transmission to close schools, businesses, and other indoor and outdoor venues where groups of people congregate. *See Lighthouse Fellowship Church v. Northam*, No. 2:20-cv-204, 2020 WL 2110416, at \*2 (E.D. Va. May 1, 2020).

On March 31, 2020, Governor Mills next issued Executive Order 28, which stated: "[a]ll persons living in the State of Maine are hereby ordered, effective as of 12:01 AM on April 2, 2020 to stay at their homes or places of residence." Executive Order 28 at 2 (ECF No. 1-4). Executive Order 28 only permitted residents to travel out of their homes if they were conducting "essential" activities or traveling to work at a business allowed to continue operations. Depending on the square footage of an essential business, Executive Order 28 placed limits on the number of customers permitted inside at any one time—permitting 5 people for buildings of less than 7,500 square feet, 15 people for buildings between 7,500 and 25,000 square feet, 50 people for buildings between 25,000 and 50,000 square feet, 75 people for buildings between 50,000 and 75,000 square feet, and 100 people for buildings larger than 75,000 square feet. Executive Order 28 states that violations constitute a class E crime.[7] Executive Order 28 stated that its prohibitions were in effect until April 30, 2020.

On April 3, 2020, Governor Mills issued a list further explaining what businesses were considered "essential" and "non-essential." Essential Business Operations Definition (ECF No. 1-5). The list of "essential" businesses included grocery stores, household goods stores, gas stations, hardware stores, home repair stores, garden centers and stores, child care services, and medical marijuana dispensaries.

---

[7]      On April 2, 2020, the Maine State Police issued a statement indicating that it would enforce Governor Mills's Executive Order but that it was "asking for voluntary compliance" with the Executive Order. As a "last course of action and reserved for only the most egregious violators," the State Police indicated that they would "[i]ssu[e] summonses or mak[e] physical arrests." State Police Enforcement Practices Regarding Governor's Executive Order 1 (ECF No. 1-9).

On April 14, 2020, Governor Mills issued a Proclamation to Renew the State of Civil Emergency in Maine, which continued the civil emergency and extended the previously issued orders for another 30 days. Proclamation to Renew the State of Civil Emergency (ECF No. 1-6).

### III.   Maine's Plan for Reopening

On April 28, 2020, Governor Mills released the "Restarting Maine's Economy" plan. Restarting Maine's Economy ("**Restarting Plan**") (ECF No. 1-8). This plan contemplates a four-phased approach to reopening businesses and activities. "Stage 1" contemplates "a continued prohibition on gatherings of more than 10 people," but explicitly provides for the opening of categories of businesses "per checklist standards." Restarting Plan at 10. With respect to religious gatherings, Stage 1 provides for "[l]imited drive-in, stay-in-your-vehicle church services." Restarting Plan at 11. Thereafter, Stage 2, scheduled to begin in June, contemplates increasing the number of people allowed at gatherings to 50. Restarting Plan at 12.

On April 29, 2020, Governor Mills issued Executive Order 49, which extended her prior Orders until May 31, 2020, and provided for the implementation of the Restarting Plan. Executive Order 49 (ECF No. 1-7). Governor Mills reiterated that the "[p]rotection of public health and our health care delivery system shall remain the first priority." Executive Order 49 at 2. As part of that approach, Governor Mills directed state agencies to continue to monitor various metrics to guide the timing and scope of easing restrictions.[8] Executive Order 49 at 2.

---

[8]      Specifically, Executive Order 49 provides:

The Order further states that, "[s]tarting May 1, 2020, . . . the Commissioner of the Department of Economic and Community Development (DECD) shall implement the Restarting Plan and identify businesses and activities where current restrictions may be adjusted to safely allow for more economic and personal activity." Executive Order 49 at 2. Any loosening of restrictions must be consistent with the guidelines stated in the Restarting Plan. As part of the reopening process, Governor Mills charged DECD with developing specific reopening checklists and standards for categories of businesses. DECD is working with industry representatives and businesses to develop industrywide checklists that will inform individual businesses and other entities about safe reopening standards.[9] In addition to providing stability and efficiency, the primary goal of this approach is "to establish uniform standards, restrictions and guidance that are capable of broad, baseline application." Decl. of Derek P. Langhauser ¶ 7 ("**Langhauser Decl.**") (ECF No. 21).

---

The Commissioner of the Department of Health and Human Services (DHHS) and the Director of the Maine Center for Disease Control and Prevention (CDC) shall continue to advise on COVID-19 trends and metrics to guide the timing, pace and scope of any easing of current restrictions. Maine CDC currently tracks, subject to change, three primary metrics:

A. a downward trajectory of reported influenza-like illnesses and COVID-like syndromic cases;

B. a downward trajectory of documented cases and newly hospitalized patients; and

C. the capacity of Maine's hospital systems to treat all patients without crisis care and the ability of the State to engage in a robust testing program.

Executive Order 49 at 2.

[9]     DECD has taken an organized approach to restarting by "identifying approximately 70 categories of the tens of thousands of Maine's business, social and other entities whose operations have been seriously affected by COVID-19." Decl. of Derek P. Langhauser ¶ 6 ("**Langhauser Decl.**") (ECF No. 21).

According to the DECD website,[10] there is a "General Checklist" that all businesses must comply with to reopen, and there are industry-specific checklists under the various categories of businesses. *See* DECD, COVID-19 Prevention Checklists, https://www.maine.gov/decd/covid-19-prevention-checklists (last visited May 9, 2020). Each industry-specific checklist identifies best practices for items related to physical distancing, hygiene, personal protection, and maintenance of clean business environment, which are necessary for the safe reopening and operation of that category of business. All of the industry-specific checklists posted on the DECD website state that they are "guidance documents" for the use of businesses so "they can be prepared to meet health guidelines and reopen safely" and note that the checklists "may be updated as additional information and resources become available." *See, e.g.*, COVID-19 Prevention Checklist for Drive-in Theaters, *available at* https://www.maine.gov/decd/covid-19-prevention-checklists (last visited May 9, 2020). Governor Mills indicates that DECD will also provide businesses with "interpretive guidance" on the checklists, and for months the Governor's counsel has been directing inquiries to the DECD. Executive Order 49 at 2; Langhauser Decl. ¶ 8.

Faith-based entities are one of DECD's approximately 70 categories. Langhauser Decl. ¶ 10. The DECD website provides the following specific guidance for "Places of Worship":

---

[10]     I take judicial notice of the Maine DECD website. *Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (pursuant to Fed. R. Evid. 201(b) the court took "judicial notice of the relevant facts provided on the [government] website, which [were] 'not subject to reasonable dispute.' ").

       A. In-person gatherings remain prohibited;
       B. Streaming and recording of services encouraged; and
       C. Drive-in services not encouraged but permitted provided:
           1. Participants stay in their vehicles;
           2. Leaders of services and signage provide notice about staying in vehicles;
           3. Only immediate household members in each vehicle;
           4. Vehicles shall be parked in manner that provides six feet of space between the occupants of adjacent vehicles;
           5. Windows are kept at least ½ way up;
           6. Any collection is executed with a drop-off receptacle that requires no contact and participants remaining in their vehicles; and
           7. Religious leaders are responsible for communicating and enforcing these restrictions.

DECD, Guidance on Governor's Executive Order 19 Regarding Places of Worship, https://www.maine.gov/decd/sites/maine.gov.decd/files/inlinefiles/Religous%20Service%20Guidance.pdf (last visited May 9, 2020).

## IV.   Calvary Chapel

Plaintiff Calvary Chapel is located and hosts services in Orrington, Maine.[11] Due to the Gathering Orders, the Plaintiff is prohibited from holding in-person services within its church building for more than ten people, a restriction that the Plaintiff contends violates its constitutional and statutory rights. Plaintiff's counsel represented to me during a teleconference on May 7, 2020, that Calvary Chapel did not contact DECD for guidance prior to filing suit. Instead, the Plaintiff emailed a letter to Governor Mills and her counsel, demanding written confirmation within less

---

[11]    The record does not provide any information about the number of members Calvary Chapel has or the number of members who regularly attend its worship services.

than 24 hours "that the 'gathering orders' . . . prohibiting churches from meetings of more than 10 people have been rescinded."[12] Demand Letter 1 (ECF No. 1-19).

When no response was received, the Plaintiff filed a Verified Complaint on May 5, 2020, asserting ten causes of action: Violation of Free Exercise Clause of First Amendment of the U.S. Constitution (Count I); Violation of Right to Peaceably Assembly under the First Amendment to the U.S. Constitution (Count II); Violation of Free Speech Clause of First Amendment to the U.S. Constitution (Count III); Violation of Establishment Clause of First Amendment to the U.S. Constitution (Count IV); Violation of Equal Protection Clause of Fourteenth Amendment to the U.S. Constitution (Count V); Violation of Republican form of Government under the Guarantee Clause of Article IV, § 4 of the U.S. Constitution (Count VI); Violation of Free Exercise of Religion under Art. 1, § 3 of the Maine Constitution (Count VII); Violation of Freedom of Speech under Art. 1, § 4 of the Maine Constitution (Count VIII); Violation of right to have laws suspended only by the Maine Legislature (Count IX); and Violation of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc—2000cc-5 (Count X).

Upon conclusion of my May 7, 2020 teleconference with counsel, and at my urging, Plaintiff's counsel communicated with counsel for the Governor asking how it might "secure permission, accommodation or conditional waiver to host parking lot, drive-in, and/or in-person religious services" in conformance with the Restarting

---

[12]     Although the Complaint states that the Plaintiff gave the Governor until 5:00 p.m. on May 5 to respond, the demand letter itself lists a deadline of 1:00 p.m.

Plan. Decl. of Horatio G. Mihet ¶ 3 (ECF No. 15) ("**Mihet Decl**."). Plaintiff's counsel states that he was informed by the Governor's counsel "that there is no mechanism or procedure under the [Restarting Plan] by which Calvary Chapel could seek or obtain any certification, permission, and/or exemption to permit parking lot, drive-in and/or in-person religious services." Mihet Decl. ¶ 4. While it may well be true that there is no permitting process in place, counsel for the Governor has averred that faith-based entities are allowed to hold drive-in services pursuant to the standards posted on the DECD website. Langhauser Decl. ¶ 11. Plaintiff has not stated that it has ever reached out to the DECD.

## LEGAL STANDARD

"[Injunctive relief] is an extraordinary and drastic remedy that is never awarded as of right." *Monga v. Nat'l Endowment for the Arts*, 323 F. Supp. 3d 75, 82 (D. Me. 2018) (quoting *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012)). In deciding whether to issue a temporary restraining order, I apply the same four-factor analysis that is used to evaluate a motion for a preliminary injunction. *Id.* These factors are:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 17–18 (1st Cir. 2006). The moving party "bears the burden of establishing that these four factors weigh in its

favor," *id.* at 18, but the likelihood of success on the merits is the most important. *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). If the movant "cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Id.*

## DISCUSSION

### I.   Plaintiff's Likelihood of Success

#### A.   Free Exercise Clause

The Free Exercise Clause, applicable to the states through the Fourteenth Amendment, holds that governments "shall make no law respecting an establishment of religion, *or prohibiting the free exercise thereof*." U.S. Const. amend. I (emphasis added). The Plaintiff contends that the Gathering Orders violate this rule because they "plainly impose significant burdens on Calvary Chapel's religious beliefs." Pl.'s Mot. 5.

Over the last several weeks, the majority of courts that have considered similar executive orders in other states have concluded that a state does not violate the Free Exercise Clause when it limits in-person religious services to ten people, at least as long as the state permits drive-in services.[13] *See Cassell v. Snyders*, No. 20-cv-50153,

---

[13]     The Plaintiff repeatedly cites to a few cases in which courts did enjoin the enforcement of COVID-19 restrictions. All are distinguishable. First, in *On Fire Christian Center, Inc. v. Fischer*, the plaintiffs challenged a ban on drive-in church services. No. 3:20-cv-264-JRW, 2020 WL 1820249 (W.D. Ky. Apr. 11, 2020). In granting the temporary restraining order to enjoin the mayor from enforcing the ban, the court noted that the city "targeted religious worship by prohibiting drive-in church services, while not prohibiting a multitude of other non-religious drive-ins and drive-throughs – including, for example, drive-through liquor stores." *Id.* at *6. Likewise, in *Maryville Baptist Church v. Beshear*, the Sixth Circuit criticized Kentucky's restrictions on religious activities but ultimately limited its decision by only enjoining the enforcement of the state's ban on drive-in services. No. 20-5427, — F.3d —, 2020 WL 2111316, at *4–*5 (6th Cir. May 2, 2020) (slip opinion). Although the court stated that the in-person limitations "should give pause," it explained that, "[i]n view of the fast-moving pace of this

13

2020 WL 2112374, at *6 (N.D. Ill. May 3, 2020); *Legacy Church, Inc. v. Kunkel*, No. CIV 20-0327 JB/SCY, 2020 WL 1905586, at *35 (D.N.M. Apr. 17, 2020). The Plaintiff has offered no reason why Maine's orders are distinguishable. For those reasons and for the reasons set forth below, I conclude that the Plaintiff is unlikely to succeed on its free exercise claims.

### 1.    Government Power During a Health Emergency

Although a government cannot use a health crisis as a pretext for trampling constitutional rights, the Supreme Court has long recognized that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Jacobson v. Commonwealth of Mass.*, 197 U.S. 11, 27 (1905). And while such an epidemic is ongoing, the "traditional tiers of constitutional scrutiny do not apply." *Cassell*, 2020 WL 2112374, at *6 (citing *Jacobson*, 197 U.S. at 27; *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020)). During that temporary time and in those narrow

---

litigation and in view of the lack of additional input from the district court, whether of a fact-finding dimension or not, we are inclined not to extend the injunction to in-person services at this point." *See id.* at *5. Maine currently permits drive-in, stay-in-your-vehicle services. *See* Langhauser Decl. ¶ 11.

Days after the Sixth Circuit decided *Maryville Baptist*, the district court extended the injunction to prevent enforcement of Kentucky's ban on "mass gatherings" as it applied to religious services. *See Maryville Baptist Church, Inc. v. Beshear*, No. 3:20-cv-00278-DJH-RSE (W.D. Ky. May 8, 2020). On the same day, another district court in Kentucky entered a similar state-wide injunction. *See Tabernacle Baptist Church, Inc. v. Beshear*, No. 3:20-cv-00033-GFVT (E.D. Ky. May 8, 2020). But those courts based their decisions on determinations that Kentucky's order was not neutral or generally applicable and that it was not narrowly tailored. Those courts were reviewing a different order than I have before me today. *See Maryville Baptist*, No. 3:20-cv-00278-DJH-RSE, at *2, *4 (noting that Kentucky's order bans "any event or convening that brings together groups of individuals" and stating the governor failed to consider simply limiting the number of people who could attend service at a time); *Tabernacle Baptist*, No. 3:20-cv-00033-GFVT, at *10 (finding order not narrowly tailored because "many of the serial exemptions for secular activities [such as law firms and laundromats] pose comparable public health risks to worship services"); *see also Roberts v. Neace*, No. 20-5465 (6th Cir. May 9, 2020). Here, Maine does allow groups of up to ten people to gather, and, as previously discussed, Maine's orders target both religious and secular conduct that poses similar health risks.

contexts, *Jacobson* instructs that courts should only overturn state action when it lacks a "real or substantial relation to the protection of the public health" or represents "a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 31. Calling upon this rule, courts across this country have repeatedly upheld orders meant to curb the spread of COVID-19, including rules that restrict in-person religious services to ten or fewer persons. *See Cross Culture Christian Ctr. v. Newsom*, No. 2:20-cv-00832-JAM, 2020 WL 2121111, at *3–*4 (E.D. Cal. May 5, 2020); *Cassell*, 2020 WL 2112374, at *6–*7; *Gish v. Newsom*, No. EDCV 20-755-JGB, 2020 WL 1979970, at *5 (C.D. Cal. Apr. 23, 2020); *Legacy Church*, 2020 WL 1905586, at *25; *see also In re Abbott*, 954 F.3d at 783–84 (admonishing district court for failing to apply *Jacobson* standard in reviewing state's restriction of non-essential medical procedures, including non-essential abortions).

Maine's Gathering Orders are likely to survive this test too. The orders are in place to protect Maine residents from the spread of a virus that can cause serious illness and death. Given what we know about how COVID-19 spreads, the nature of the orders—in permitting drive-in services, online services, and small gatherings, while restricting large assemblies of people—demonstrates a substantial relation to the interest of protecting public health. For these reasons, I conclude that the Plaintiff is unlikely to succeed on its claim that the Gathering Orders violate the Free Exercise Clause.

### 2.    Traditional Free Exercise Clause Analysis

Even if the *Jacobson* standard was inapplicable, the Gathering Orders would likely still survive the Plaintiff's free exercise challenge. Under traditional analysis

of the Free Exercise Clause, "neutral, generally applicable laws" are subject to rational basis review, even where they are applied to religious practice. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694 (2014).

A law is not neutral if its object is to "infringe upon or restrict practices because of their religious motivation." *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 533 (1993). A lack of neutrality can be clear from the face of the law if it "refers to a religious practice without a secular meaning discernable from the language or context." *Id.*; *see also Perrier-Bilbo v. United States*, 954 F.3d 413, 429 (1st Cir. 2020). But the Free Exercise Clause also forbids "subtle departures from neutrality," including evidence of bias that might not be reflected in the law's text. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018). In determining if a law's object is neutral, courts consider "the effect of [the] law in its real operation" and often call upon principles developed in equal protection cases. *Lukumi*, 508 U.S. at 535, 540. Thus, a law will be found to violate the Free Exercise Clause if it was enacted "because of," not merely "in spite of," its restrictions on religious practice. *Id.* at 540. Relevant evidence on this point can include a proscription of religious activity in a way not applied to comparable secular activity; a "pattern" of "animosity" towards the religious group by the drafters; and the suppression of "much more religious conduct than is necessary" to achieve the asserted, legitimate purposes. *Id.* at 536, 542, 543.

Here, the Gathering Orders are plainly neutral. They prohibit all non-essential gatherings of more than ten people. There are no facts suggesting that Governor Mills

has any animus towards religious organizations. And under the Gathering Orders, churches remain free to conduct drive-in services, online programs, and in-person assemblies of up to ten people.[14] The Gathering Orders are thus designed to restrict only the aspects of the religious conduct—the large, in-person gatherings—that undermine the secular purpose of slowing the spread of COVID-19.

Nevertheless, the Plaintiff asserts that the Gathering Orders are not neutral because religious organizations have been targeted and restricted in ways that secular entities have not. In particular, the Plaintiff notes that there is an exemption from the ten-person limit for "liquor stores, warehouse clubs, supercenter stores, [and] marijuana dispensaries."[15] Pl.'s Mot. 6. But, in this free exercise analysis, the question is not whether any secular entity faces fewer restrictions than any religious one. To be comparable, the secular conduct must "endanger[ ] [the government's]

---

[14]    The Plaintiff contends that the Gathering Orders are not neutral on their face because they "expressly target 'religious' or 'faith-based' gatherings for disparate treatment." Pl.'s Mot. 6. To be sure, the orders do include those terms in listing the types of gathering that are limited to ten or fewer people. *See, e.g.*, Exec. Order 14 (ECF No. 1-2) ("Such gatherings include, without limitation, community, civic, public, leisure, and faith-based events . . . ."). But the mere reference to religious activity as part of a list of broader activities covered by the orders does not show that the order's "object or purpose" was to target religious activity for harsher treatment. *See Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 533 (1993); *Maryville Baptist Church*, 2020 WL 2111316, at *3 (noting that mentioning religious gathering "by name" does not establish "that the Governor singled out faith groups"); *Cassell v. Snyders*, No. 20-cv-50153, 2020 WL 2112374, at *10 (N.D. Ill. May 3, 2020).

[15]    In multiple places, the Plaintiff asserts that the Governor has exempted casinos from the restrictions that churches face, and it implies that casinos are permitted to continue operations. *See, e.g.*, Pl.'s Mot. 7 ("large numbers of people may gather at . . . casinos"); Pl.'s Mot. 8 ("large gatherings at . . . casinos . . . are not prohibited"); Pl.'s Mot. 12 ("the State has created carveouts for gatherings of more than 10 individuals at . . . casinos"). I have reviewed the executive orders contained in the record, and I cannot find any support for this proposition. Executive Order 19 permits casinos to engage in certain activities—including taking remote orders, ensuring security, and processing payroll—but prohibits them from engaging in "customer, vendor or other visitor in-person contact." Executive Order 19 at 3 (ECF No. 1-3) (also stating that activities are only permitted if they "do not require more than 10 workers to convene in space where social distancing is not possible" and "are facilitated to the maximum extent practicable by employees working remotely").

interests in a similar or greater degree than" the religious conduct. *Lukumi*, 508 U.S. at 543.

The Plaintiff is unlikely to succeed in establishing that the conduct at the secular businesses that it identifies is comparable to the conduct at religious gatherings. "In other parts of the country, houses of worship have been linked to the spread of COVID-19."[16] Shah Decl. ¶ 29. "Gatherings in houses of worship present a greater risk to the public health than shopping at a grocery store or other retail outlet. Shoppers, particularly in the current environment, enter a store, gather the items they need as quickly as possible, check out, and promptly leave. Shah Decl. ¶ 25. In contrast, the Plaintiff seeks to hold worship service for "no more than a few hours twice per week." Pl.'s Mot. at 16–17.

Several other courts have distinguished churches from places where individuals shop, noting that the purpose of shopping—unlike the purpose of community-centered religious organizations—is not to congregate and converse but instead to find and purchase items with limited contact with others. *See Cassell*, 2020 WL 2112374, at *9; *Gish*, 2020 WL 1979970, at *6. Religious gatherings, on the other hand, are more akin to restaurants, entertainment venues, movie theaters, and schools, all of which face the same restrictions as the Plaintiff. *See id.*

---

[16]     "[T]he Director of the Sacramento County Department of Health Services announced last month that at least 70 members of a local church were infected with COVID-19. The Secretary of the Kansas Department of Health and Environment announced that of the eleven coronavirus clusters in Kansas recorded at the time, three were tied to church gathers. . . . Recent epidemiological studies suggest that singing may release additional coronavirus into the air, increasing the likelihood of infection. For example, a recent investigation traced a COVID-19 outbreak to a choir practice session." Shah Decl. ¶¶ 29–30.

The Gathering Orders are also generally applicable. As the Supreme Court explained in *Lukumi*, although "[a]ll laws are selective to some extent, . . . categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice." *Lukumi*, 508 U.S. at 542. Even "in pursuit of legitimate interests," the government "cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Id.* at 543 (noting that this principle "has parallels in our First Amendment jurisprudence").

The Plaintiff asserts that the Gathering Orders are not generally applicable because they exempt "large crowds and masses of people gathered at numerous businesses and other non-religious entities." Pl.'s Mot. 7. But, again, these exempted entities do not foster the same type of assembly as the entities—both religious and secular—that are subject to the Gathering Orders' restrictions. Schools, movie theaters, concert halls, sports venues, synagogues, mosques, and churches all fall under the Gathering Orders' umbrella and are all burdened by the ten-person limit. The places covered by the General Orders are places where "people sit together in an enclosed space to share a communal experience." *Gish*, 2020 WL 1979970, at *6. The Governor has thus not selectively "impose[d] burdens only on" religious conduct, but rather equally on all types of conduct that are likely to spread COVID-19. *See Lukumi*, 508 U.S. at 543.

Because I conclude that the Gathering Orders are neutral and generally applicable, the Plaintiff would have to show that they are unsupported by a rational basis in order to prevail. Given the Governor's interest in limiting the spread of

COVID-19, a highly contagious illness that spreads more easily through close contact, the Plaintiff is likely unable to make such a showing.

### B.    Establishment Clause

The Plaintiff also contends that the Gathering Orders violate the Establishment Clause. This claim appears to rest on the same allegations as the free exercise claim, namely that the Governor has targeted religious gatherings and has subjected religious organizations to stricter limitations than she has imposed on secular ones.

As noted above, the First Amendment prohibits governments from making any law "respecting an establishment of religion." U.S. Const. amend. I. The "clearest command" of this provision is that "one religious denomination cannot be officially preferred over another, . . . nor can the government prefer religion over nonreligion." *Perrier-Bilbo*, 954 F.3d at 422 (internal quotations omitted). Under the test developed in *Lemon v. Kurtzman*, government action survives an Establishment Clause challenge if (1) it has "a secular legislative purpose," (2) its "*principal* or *primary*" effect "neither advances nor inhibits religion," and (3) it does "not foster an excessive government entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971) (internal quotations omitted) (emphasis added); *see also Freedom From Religion Found. v. Hanover Sch. Dist.*, 626 F.3d 1, 9 (1st Cir. 2010). The Gathering Orders are likely to pass this test. As discussed above, the orders have the secular purpose of slowing the spread of COVID-19; they have the primary effect of limiting gatherings—both secular and religious—which has been shown to slow the spread of COVID-19; and the Plaintiff develops no argument that the orders foster government

entanglement with religion. As such, I conclude that the Plaintiff is unlikely to succeed on its Establishment Clause claim.

### C.   Free Speech and Assembly

Finally, the Plaintiff asserts that the Gathering Orders impermissibly infringe on its First Amendment rights to free speech and assembly. Specifically, the Plaintiff contends that the Gathering Orders "discriminate against Calvary Chapel's free speech rights and rights to assemble on the basis of content." Pl.'s Mot. 11.

Both of these claims, however, are premised on the Plaintiff's assertion that the Gathering Orders unconstitutionally target and restrict its religious exercise. Because I have already concluded that the Gathering Orders do not impermissibly restrict the Plaintiff's free exercise of religion, the Plaintiff is unlikely to prevail on these claims as well.[17] *See Gish*, 2020 WL 1979970, at *7.

---

[17]     I also doubt that the Plaintiff will succeed in showing that the Gathering Orders are "content based on their face," as the Plaintiff asserts, which would subject the orders to strict scrutiny. Pl.'s Mot. 11. Even if the orders were subject to heightened scrutiny, the Governor would likely be able to show that they serve a compelling government interest (preventing the spread of COVID-19) and that they are narrowly tailored to achieve that interest, particularly because they do not restrict drive-in or streamed services and because, as discussed above, they do not impermissibly single out religious groups.

     In denying similar motions for temporary restraining orders, other courts have recently concluded that plaintiffs were unlikely to succeed on their freedom of speech and assembly claims. *See Lighthouse Fellowship Church*, 2020 WL 2110416, at *10–*13 (finding that no expressive conduct or speech was targeted by the governor's order, but concluding that, even if there was, governor's order served a substantial interest unrelated to the suppression of expression, was narrowly tailored, and left open ample alternative channels for communication); *Legacy Church, Inc. v. Kunkel*, No. CIV 20-0327 JB/SCY, 2020 WL 1905586, at *38 (D.N.M. Apr. 17, 2020) (finding that New Mexico's order was "reasonably related to the demands of the public health crisis" and that, even if the order "was subject to a strict scrutiny analysis, the Court would conclude that it meets strict scrutiny").

## II.    Remaining Factors

While the likelihood of success on the merits is the most important of the four factors used in evaluating a motion for a temporary restraining order, I will touch on the remaining factors briefly.

First, I consider the potential irreparable harm to the Plaintiff if I decline to enter a temporary restraining order enjoining enforcement of the Gathering Orders. Importantly, as the Plaintiff made clear in the telephonic conference of counsel, the relief that it is seeking in this litigation is to be treated in the same fashion as an essential business. In its supplemental filing, the Plaintiff stated that Calvary Chapel is approximately 10,000 square feet. Mihet Decl. ¶ 6. Essential businesses of that size that are open to the public may only have 15 people inside at one time. *See* Executive Order 28 at 4. Accordingly, the harm to Calvary Chapel if no injunction issues is that it will only be able to hold in-person services for ten participants rather than fifteen participants. This harm is further undercut by the availability of alternate ways to congregate in the form of "drive-in, stay-in-your-vehicle church services."

Next, I consider the balance of the relevant impositions. The hardship to the Plaintiff outlined above must be balanced against the hardship to the State if the temporary restraining order is entered. The harm to the State that would come from an order requiring it to exempt religious institutions from gathering restrictions is profound. If the prevalence of COVID-19 pulses up within a community, it puts lives, and particularly the lives of our most vulnerable citizens and the health care workers trying to save them, at risk. It also threatens the precarious steps we are making toward reopening.

Finally, I consider the effect of my ruling on the public interest. The State is managing an extraordinary array of issues, and it has responded to the challenges raised by COVID-19 by establishing uniform standards and restrictions that are based on evolving scientific evidence. Governor Mills has laid out a path for organizations to seek to ease restrictions. Upsetting the careful balance being drawn by Maine's Governor at this time would have an adverse effect on the public interest.

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Plaintiff's Motion for a Temporary Restraining Order.


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 9th day of May, 2020.