## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

CALVARY CHAPEL OF BANGOR,    )
    )
       Plaintiff,    )
    )
v.    )   Docket No. 1:20-cv-00156-NT
    )
JANET MILLS,    )
    )
       Defendant.    )

## ORDER ON DEFENDANT'S MOTION TO DISMISS AND PLAINTIFF'S PENDING MOTIONS FOR INJUNCTIVE RELIEF

On Tuesday, May 5, 2020, Plaintiff Calvary Chapel of Bangor ("**Calvary Chapel**") filed a ten-count Complaint (ECF No. 1) against Janet Mills, Governor of Maine (the "**Governor**" or "**Governor Mills**"), alleging that the Governor's orders issued in response to COVID-19, which at the time limited the size of gatherings to ten people, violated Calvary Chapel's constitutional and statutory rights. Along with its Complaint, Calvary Chapel filed a motion for a temporary restraining order and preliminary injunction (ECF No. 3). I denied the motion for a temporary restraining order on May 9, 2020 (ECF No. 27), and I subsequently denied the Plaintiff's motion for injunction pending appeal (ECF No. 33). On December 22, 2020, the First Circuit dismissed Calvary Chapel's appeal for lack of appellate jurisdiction[1] (ECF No. 38). Since my May 9, 2020 Order, Governor Mills has amended her orders, loosened the

---

[1]     Calvary Chapel filed a petition for writ of certiorari on March 22, 2021. The Supreme Court initially requested a response from the Governor by June 9, 2021, but later granted the Governor's motion to extend the time to file her response to July 9, 2021. This petition is still pending. Neither party moved to stay these proceedings.

restrictions on gatherings, and ultimately removed all limits on gatherings. At no time did Calvary Chapel seek to amend its Complaint despite an invitation from the Defendant to do so. Def.'s Opp'n to Pl.'s Prelim. Inj. Mot. ("**Def.'s Opp'n**") 8 (ECF No. 51). Governor Mills has now moved to dismiss the Complaint as moot (ECF No. 43), and Calvary Chapel has filed a renewed motion for a preliminary injunction (ECF No. 45). For the reasons set forth below, the Governor's motion is **GRANTED**, and Calvary Chapel's motion is **DENIED**.

## BACKGROUND

### I.  The COVID-19 Pandemic and Maine's Response

The 2019 Novel Coronavirus ("**COVID-19**") is a respiratory illness caused by a coronavirus known as SARS-CoV-2. Decl. of Nirav Dinesh Shah, M.D., J.D.[2] ¶ 9 ("**Shah Decl.**") (ECF No. 20). COVID-19 was first identified in January of 2020, and it has since swept the globe. Shah Decl. ¶¶ 9, 11. On January 31, 2020, the United States Department of Health and Human Services determined that COVID-19 constituted a nationwide public health emergency. Shah Decl. ¶ 10. On March 11, 2020, the World Health Organization declared a global pandemic. Shah Decl. ¶ 10. On March 13, 2020, President Donald Trump declared a National Emergency.[3]

When Calvary Chapel filed its Complaint in May of 2020, less was known about COVID-19, *see* Decl. of Gerald D. Reid ("**Reid Decl.**") ¶ 3 (ECF No. 44), though

---

[2]      Dr. Shah is the Director of the Maine Center for Disease Control and Prevention. Decl. of Nirav Dinesh Shah, M.D., J.D. ¶ 1 (ECF No. 20).

[3]      President Trump made the National Emergency retroactive to March 1, 2020. Subsequently, all fifty states and the District of Columbia declared emergencies.

experts believed that it spread (1) through respiratory droplets produced when an infected person coughs, sneezes, or talks; (2) through close personal contact, such as touching or shaking hands; and (3) through touching an object or surface containing the virus and then touching one's mouth, nose, or eyes, Shah Decl. ¶ 13. Experts also believed that the virus could travel up to six feet through the air, and that it could live on surfaces, such as cardboard, for up to twenty-four hours. Shah Decl. ¶ 14. At the time, there was neither a vaccine for COVID-19 nor any effective pharmaceutical treatment. Shah Decl. ¶ 18; Reid Decl. ¶ 11. Thus, experts advised that the most effective way to control the virus was to practice "social distancing," also referred to as "physical distancing." Shah Decl. ¶ 19.

In the months since Calvary Chapel filed its Complaint, COVID-19 cases have risen and fallen in the United States and in Maine, and vaccines for the virus have been developed and distributed. Reid Decl. ¶¶ 7, 11. From March 2020 to mid-October 2020, the rate of new COVID-19 cases in Maine was relatively stable. Reid Decl. ¶ 7. There were never more than fifty new cases a day in the State, and only rarely were there more than thirty new cases in a day. Reid Decl. ¶ 7. At the end of October of 2020, however, Maine began to experience a dramatic increase in new cases. Reid Decl. ¶ 7. Ninety-eight new cases were reported on October 31, 249 new cases were reported on November 30, and 590 new cases were reported on December 30. Reid Decl. ¶ 7. This rise peaked on January 15, 2021, when 823 new cases were reported. Reid Decl. ¶ 7. The state has since seen a decline in new cases, with 301 reported on February 4, 2021. Reid Decl. ¶ 7. On June 3, 2021, Maine CDC reported seventy-

seven new cases, *see* New Daily COVID-19 Cases, Me. Ctr. for Disease Control & Prevention, available at https://www.maine.gov/dhhs/mecdc/infectious-disease/epi/ airborne/coronavirus/data.shtml (last visited June 4, 2021), and the State of Maine's COVID-19 Vaccination Dashboard reflects that 60.09% of Maine's eligible populace has received final doses of the COVID-19 vaccine, *see* COVID-19 Vaccination Dashboard, Office of the Governor, available at https://www.maine.gov/covid19/vaccines/ dashboard (last visited June 4, 2021).[4]

## II.   Maine's Efforts to Combat COVID-19

Throughout the last year, Governor Mills has issued numerous executive orders addressing the COVID-19 health crisis. Most of the orders at issue in this case restricted the size of gatherings and the number of people permitted inside buildings. Because the restrictions have changed since Calvary Chapel filed its Complaint, I discuss these orders chronologically. First, I address the Governor's early response to COVID-19 and the orders that were in place when Calvary Chapel filed its Complaint. Next, I discuss Calvary Chapel's challenge to these orders. And finally, I turn to the orders the Governor issued in the subsequent months.

### A.   Executive Orders Before May 5, 2020

Governor Mills declared a "state of emergency" in Maine on March 15, 2020. Proclamation of State of Civil Emergency to Further Protect Public Health ("**Emergency Proclamation**") (ECF No. 1-1). In that Emergency Proclamation,

---

[4]      I may take judicial notice of matters appearing on an official government website, which are not subject to reasonable dispute. *Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010).

Governor Mills stated that COVID-19 "poses an imminent threat of substantial harm to our citizens" and directed various state agencies to implement certain restrictions and orders to facilitate the State's response. Emergency Proclamation, at 1. Governor Mills has issued proclamations renewing the state of emergency every month since. Def.'s Mot. to Dismiss ("**Def.'s Mot.**") 2 n.1 (ECF No. 43) (citing Proclamations, Office of Governor Janet T. Mills, https://www.maine.gov/governor/mills/official_documents/proclamations).

In the early days of the COVID-19 pandemic, Maine took an extremely cautious approach with respect to activities that could pose risks of transmitting the virus. Reid Decl. ¶ 3. On March 18, 2020, Governor Mills issued Executive Order 14 FY 19/20, which stated that "[g]atherings of more than 10 people are prohibited throughout the State" and declared that such a prohibition was mainly aimed at "social, personal, and discretionary events," including those gatherings that are "faith-based."[5] An Order to Protect Public Health ("**Executive Order 14 FY 19/20**"), at 1 (ECF No. 1-2).

Then, on March 24, 2020, Governor Mills issued Executive Order 19 FY 19/20 ("**Executive Order 19**") (ECF No. 1-3). This Order continued the prohibition of all gatherings of more than ten people but carved out an exemption for businesses

---

[5]       Governor Mills's Order was consistent with the recommendations of President Trump and the U.S. Centers for Disease Control and Prevention that all people avoid social gatherings of more than ten people; work and attend school from home whenever possible; avoid eating or drinking at bars, restaurants, and food courts; avoid discretionary travel, shopping, or social visits; and practice good hygiene. *See Lighthouse Fellowship Church v. Northam*, 458 F. Supp. 3d 418, 425 (E.D. Va. 2020). The federal guidance advised governors of states with evidence of community transmission to close schools, businesses, and other indoor and outdoor venues where groups of people congregate. *See id.*

5

deemed "essential." Businesses deemed "essential" were permitted to continue operations subject to the requirement that they adhere to social distancing guidelines—maintaining a six-foot distance between individuals—and other "social distancing requirements." Executive Order 19, at 2. Under the Order, essential businesses included "grocery and household goods" stores, "gas stations," and "home repair, hardware and auto repair" stores. Executive Order 19, at 2. Executive Order 19 ordered "non-essential" businesses to cease activities at public-facing sites, but it permitted them to conduct limited activities, provided that the activities did "not allow customer, vendor or other visitor in-person contact"; did "not require more than 10 workers to convene in space where social distancing [was] not possible"; and were "facilitated to the maximum extent practicable by employees working remotely." These non-essential businesses included "shopping malls, theaters, casinos, fitness and exercise gyms . . . and similar personal care and treatment facilities." Executive Order 19 at 3.

On March 31, 2020, Governor Mills next issued Executive Order 28 FY 19/20, which stated: "[a]ll persons living in the State of Maine are hereby ordered, effective as of 12:01 AM on April 2, 2020 to stay at their homes or places of residence." An Order Regarding Further Restrictions on Public Contact and Movement, Schools, Vehicle Travel and Retail Business Operations ("**Executive Order 28**"), at 2 (ECF No. 1-4). Executive Order 28 only permitted residents to travel out of their homes if they were conducting "Essential Activities" or traveling to work at a business allowed

to continue operations.[6] Executive Order 28, at 2. On April 3, 2020, Governor Mills issued a list further explaining which businesses were considered "essential" and "non-essential." Essential Business Operations Definitions (ECF No. 1-5). The list of "essential" businesses included grocery stores, household goods stores, gas stations, hardware stores, home repair stores, garden stores, child-care services, and medical marijuana dispensaries.

Later that month, on April 10, 2020, Governor Mills issued Executive Order 28-A FY 19/20, which placed limits on the number of customers permitted inside retail stores at any one time—permitting five people for buildings of less than 7,500 square feet, fifteen people for buildings between 7,500 and 12,000 square feet, thirty-five people for buildings between 12,000 and 18,000 square feet, forty-five people for buildings between 18,000 and 40,000 square feet, seventy people for buildings between 40,000 and 60,000 square feet, and one hundred people for buildings larger than 60,000 square feet. An Order Updating Executive Order 28 FY 19/20 ("**Executive Order 28-A**") (ECF No. 43-6).

On April 28, 2020, Governor Mills released the "Restarting Maine's Economy" plan. Restarting Maine's Economy ("**Restarting Plan**") (ECF No. 1-8); Compl. ¶ 44. This plan contemplated a four-phased approach to reopening businesses and activities and abandoned the distinction between essential and non-essential businesses. Restarting Plan, at 9. "Stage 1" contemplated "a continued prohibition on

---

[6]     The Governor maintains that, under her interpretation of this order, individuals were permitted to leave their homes to attend religious services. Def.'s Opp'n to Pl.'s Prelim. Inj. Mot. 4–5 n.3 (ECF No. 51).

gatherings of more than 10 people," but explicitly provided for the opening of categories of businesses "per checklist standards." Restarting Plan, at 10. With respect to religious gatherings, Stage 1 provided for "[l]imited drive-in, stay-in-your-vehicle church services." Restarting Plan, at 11. Thereafter, Stage 2, scheduled to begin in June of 2020, contemplated the number of people permitted at gatherings to increase to fifty, and Stage 3, which was scheduled to begin in July or August of 2020, would maintain the fifty-person limit but would expand the businesses that could open in compliance with checklist standards. Restarting Plan, at 12–13. Stage 4, which had an uncertain date when the Restarting Plan was introduced, would permit all businesses to open with appropriate safety modifications. Restarting Plan, at 14.

On April 29, 2020, Governor Mills issued Executive Order 49 FY 19/20, which extended Executive Orders 14 FY 19/20, 19, and 28 until May 31, 2020, and provided for the implementation of the Restarting Plan. An Order to Stay Safer at Home ("**Executive Order 49**") (ECF No. 1-7). Governor Mills reiterated that the "[p]rotection of public health and our health care delivery system shall remain the first priority." Executive Order 49, at 2. As part of that approach, Governor Mills directed state agencies to continue to monitor various metrics to guide the timing and scope of easing restrictions. Executive Order 49, at 2. Executive Order 49 also instructed the Commissioner of the Department of Economic and Community Development ("**DECD**") to "identify businesses and activities where current restrictions may be adjusted to safely allow for more economic and personal activity." Executive Order 49, at 2. Part of this process involved DECD's development of

reopening checklists and standards for categories of businesses and activities, including for faith-based entities. *See Calvary Chapel of Bangor v. Mills*, 459 F. Supp. 3d 273, 281 (D. Me. 2020) (identifying DECD's specific guidance for "Places of Worship," which at the time included prohibiting in-person gatherings, encouraging streaming of services, and protocols for holding drive-in services).

## B.   Calvary Chapel's Complaint and Initial Motion

These orders constituted the restrictions in place when the Plaintiff filed its Complaint. In its Complaint, Calvary Chapel, which is located and hosts services in Orrington, Maine,[7] alleges that the "GATHERING ORDERS"—specifically identified as Executive Orders 14, 19, 28, 49 and the Restarting Plan—prohibited it from holding in-person services for more than ten people within its church building, while exempting certain secular activities. Compl. ¶¶ 2, 9, 17, 50. The Complaint asserts the following ten causes of action, each attacking the GATHERING ORDERS on their face and as applied: Violation of the Free Exercise Clause of the First Amendment (Count I); violation of the Right to Peaceable Assembly under the First Amendment (Count II); violation of the Free Speech Clause of the First Amendment (Count III); violation of the Establishment Clause of the First Amendment (Count IV); violation of the Equal Protection Clause of the Fourteenth Amendment (Count V); violation of the right to a republican form of government under the Guarantee Clause of Article IV, § 4 (Count VI); violation of the Free Exercise of Religion under Art. 1, § 3 of the

---

[7]     The Plaintiff has not provided any information about the number of members Calvary Chapel has or the number of members who regularly attend its worship services.

Maine Constitution (Count VII); violation of the Freedom of Speech under Art. 1, § 4 of the Maine Constitution (Count VIII); violation of the right to have laws suspended only by the Maine Legislature (Count IX); and violation of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc—2000cc-5 ("**RLUIPA**") (Count X).

The Complaint seeks an injunction preventing the Governor from enforcing the GATHERING ORDERS,[8] a declaratory judgment that the GATHERING ORDERS violate Calvary Chapel's constitutional and statutory rights,[9] and nominal damages for those violations.

---

[8]   The Complaint seeks an injunction preventing the Governor from "enforcing the GATHERING ORDERS so that":

- the orders are not applied in a way that violates Calvary Chapel's constitutional and statutory rights;

- the orders are applied "in a manner that treats Calvary Chapel's religious gatherings on equal terms as gatherings for or in so-called 'essential' businesses and non-religious entities";

- the Governor "will permit religious gatherings so long as they comply with the same social distancing and personal hygiene recommendations pursuant to which the State allows so-called 'essential' commercial and non-religious entities . . . to accommodate gatherings of persons without numerical limit under the GATHERING ORDERS";

- the Governor "will permit Calvary Chapel the opportunity to comport their behavior to any further limitations or restrictions that the State may impose in any future modification, revision, or amendment of the GATHERING ORDERS or similar legal directive";  and

- the Governor will cease issuing notices of criminal violation to Calvary Chapel and will not bring any further enforcement actions against Calvary Chapel.

Compl. 41–42.

[9]   Calvary Chapel seeks a declaration that:

- "the GATHERING ORDERS both on their face and as applied by the State are unconstitutional";

- the "State has violated" Calvary Chapel's constitutional rights "by impermissibly prohibiting religious gatherings";

The thrust of the Plaintiff's religious, speech, and assembly claims is that the Governor has applied more restrictive rules to religious gatherings than to secular activities, and the Plaintiff repeatedly states that it wants this "discriminatory" treatment ended. *See* Compl. 41–42 (asking the Court to require the State to apply the GATHERING ORDERS "in a manner that treats Calvary Chapel's religious gatherings on equal terms as gatherings for or in so-called 'essential' businesses and non-religious entities"); *see also* Compl. ¶¶ 73, 96, 129; Pl.'s Notice of Suppl. Authority 1–2 (ECF No. 26) (explaining that what "Calvary Chapel has requested in this matter" is "to be treated equally with similar non-religious gatherings that are not subject to the same outright prohibition – under threat of criminal sanction – as that imposed on churches").

---

- the "State has violated" Calvary Chapel's constitutional rights by "applying criteria that are neither neutral nor generally applicable to religious and non-religious gatherings, by establishing a religious gerrymander against religious gatherings, and by establishing a system of individualized exemptions that exclude similarly situated non-religious gatherings from the prohibitions applicable to Calvary Chapel's religious gatherings";

- the "State has violated" Calvary Chapel's equal protection rights "by impermissibly prohibiting religious gatherings, and by applying criteria that treats religious gatherings in a discriminatory and dissimilar manner as that applied to various non-religious gatherings";

- the "State has violated the Establishment Clause by impermissibly demonstrating hostility towards religious gatherings and by impermissibly showing favoritism to certain non-religious gatherings"; and

- the "State has violated the Religious Land Use and Institutionalized Persons Act by substantially and impermissibly burdening Calvary Chapel's sincerely held religious beliefs and treating unequally as compared to other non-religious assemblies or institutions, by imposing draconian prohibitions on Calvary Chapel's sincerely held religious beliefs without a compelling government interest, and without deploying the least restrictive means to achieve any permissible government interest."

Compl. 42–43.

When it filed its Complaint, the Plaintiff also filed a motion for a temporary restraining order and a preliminary injunction. That motion asserted that the GATHERING ORDERS violated its First Amendment rights, and the Plaintiff sought an order enjoining Governor Mills from "enforcing, attempting to enforce, threatening to enforce, or otherwise requiring compliance with any prohibition on religious gatherings." Pl.'s Mot. for TRO & Prelim. Inj. 3–4 (ECF No. 3) (emphasis deleted) (adding that "Calvary Chapel merely seeks to be free from the unconstitutionally unequal application of the [orders] in such a way that the Church and its pastor and congregants are [not] threatened with criminal sanctions for simply having a church service" (emphasis deleted)).

I held a telephone conference with counsel for the Plaintiff and Defendant on May 7, 2020. I denied the motion for a temporary restraining order on May 9, 2020 (ECF No. 27). Calvary Chapel appealed that denial, and the First Circuit dismissed the appeal for lack of appellate jurisdiction on December 22, 2020.

## C.    Developments Since May of 2020

Since I denied the motion for a temporary restraining order, Governor Mills has issued several new executive orders that have altered the restrictions on gatherings. On June 1, 2020, the Governor increased the limit on indoor gatherings from ten to fifty people. An Order to Further Implement the Restarting Plan ("**Executive Order 55**"), at 2 (ECF No. 43-2). Executive Order 55 also called for the easing of the stay-at-home order to enable people to "access the increased business and personal activities that [were] being reopened" and the continued "phas[ing] out" of the distinction between essential and non-essential businesses that had been set

forth in Executive Order 19. Executive Order 55, at 2. Consistent with this approach, Executive Order 28-A-2 FY 19/20, which was issued on June 16, implemented a limit of five people per 1,000 square feet for retail establishments, with no mention of essential activities. An Order Reamending Executive Order 28 FY 19/20 ("**Executive Order 28-A-2**") (ECF No. 43-7).

On August 1, 2020, the limit on outdoor gatherings was increased to the lesser of five people per 1,000 square feet or 100 people. An Order Regarding Outdoor Gatherings and Face Coverings for Children ("**Executive Order 6**") (ECF No. 43-3). In October, a similar increase was briefly instituted for indoor gatherings that provided seating to guests, *see* An Order to Implement Phase Four of the Restarting Maine's Economy Plan ("**Executive Order 14 FY 20/21**"), at 3 (ECF No. 43-4), but all indoor gatherings were returned to a fifty-person limit on November 4, 2020, *see* An Order to Revise Indoor Gathering Limits, Strengthen Face Covering Requirements and Delegate Certain Authority ("**Executive Order 16**"), at 3 (ECF No. 43-5).

Aside from that brief period in October of 2020 when some indoor limits were increased, indoor religious gatherings were permitted to accommodate up to fifty people from June of 2020 until February of 2021, which aligned with the same restriction imposed on all indoor gatherings, though retail businesses could still hold five people per 1,000 square feet. *See* Executive Order 55 (setting fifty-person cap for gatherings, effective June 1); Executive Order 28-A-2 (setting limits for retail locations).

On February 12, 2021, Governor Mills issued Executive Order 31 FY 20/21, which expanded the gathering limit for houses of worship to the greater of fifty people or five people per 1,000 square feet. An Order Amending Indoor Gathering Limits ("**Executive Order 31**") (ECF No. 52-1). This meant that religious gatherings were treated more favorably than other indoor gatherings, which were still restricted to fifty people no matter the size of the space,[10] and more favorably than retail stores, which could only admit five people per 1,000 square feet.[11]

On March 5, 2021, Governor Mills issued Executive Order 35 FY 20/21, which provided for increases to indoor and outdoor gathering limits in March and May. An Order Amending Gathering Limits and Travel Restrictions to Reflect Current Conditions and the Best Available Science ("**Executive Order 35**") (ECF No. 52-2). Executive Order 35 amended and superseded inconsistent restrictions from earlier orders and repealed the occupancy limits for retail stores that were implemented in Executive Order 28-A-2. Executive Order 35, at 2. As of March 26, the limit for indoor gatherings and stores was the largest of fifty percent of permitted occupancy for the space, five people per 1,000 square feet, or fifty people. Executive Order 35, at 2. Outdoor gatherings at facilities with occupancy limits could hold seventy-five percent of the permitted occupancy, a limit that was set to increase to one hundred percent

---

[10]    As an illustration, a basketball game in a 12,000 square-foot gymnasium would only be able to accommodate fifty people, but a 12,000 square-foot church could accommodate sixty people.

[11]    This means that a 9,000 square-foot retail store would have to limit capacity to forty-five people, but a 9,000 square-foot church could have fifty people.

on May 24. Executive Order 35, at 2. Executive Order 35 makes no distinction between essential and non-essential activities.

Although Executive Order 35 also called for increases to seventy-five percent of capacity for indoor gatherings on May 24, 2021,[12] Executive Order 35, at 2, Governor Mills subsequently issued Executive Order 38. That Order, which is currently in effect, amended Executive Order 35 and stated that all indoor gatherings and in-store customer limits would be increased to one hundred percent capacity on May 24, 2021. An Order to Amend Indoor Gathering and In-Store Customer Limits ("**Executive Order 38**"), available at https://www.maine.gov/governor/mills/sites/ maine.gov.governor.mills/files/inline-files/EO%2096%2038.pdf. **In other words, there are currently no capacity restrictions on any indoor gatherings.**

## III.   Pending Motions

Governor Mills filed a motion to dismiss on February 9, 2021. She argues that this case is moot because the Complaint challenges outdated executive orders limiting all gatherings to ten people, a restriction that was supplanted by Executive Order 55, issued on May 29, 2020, which increased the limit to fifty people. Def.'s Mot. 1. She adds that, "[g]iven the expertise the State has developed since the early days of the pandemic . . . , the fact that the Governor did not return to the old limit even when COVID-19 cases increased dramatically, and a recent United States Supreme Court decision [that] enjoin[ed] restrictions on religious gatherings in another state, it is

---

[12]   Pursuant to Executive Order 35, beginning May 24, 2021, indoor gatherings and stores would have been permitted to accommodate the greatest of seventy-five percent of their permitted occupancy, five people per 1,000 square feet, or fifty people. Executive Order 35, at 2.

highly unlikely that [she] will return to the ten-person limit." Def.'s Mot. 1. Thus, she contends that "there is no longer a live controversy" or "meaningful relief the Court could provide." Def.'s Mot. 6–7.

Calvary Chapel renewed its motion for a preliminary injunction on February 18, 2021. In its motion, Calvary Chapel asks the Court to enjoin the Governor "from enforcing her unconstitutional and discriminatory COVID-19 restrictions on Calvary Chapel's religious worship services." Pl.'s Renewed Mot. for Prelim. Inj. ("**Pl.'s Mot.**") 1 (ECF No. 45).

As noted, after briefing on these motions was complete, Governor Mills lifted all capacity restrictions on indoor gatherings effective May 24, 2021. Although counsel for Calvary Chapel acknowledged this impending change in a telephone conference I held on May 17, it contends that it remains "under a constant threat" that Governor Mills will reimpose discriminatory gathering restrictions. *See* Pl.'s Surreply in Supp. of Its Renewed Mot. for Prelim. Inj. ("**Pl.'s Sur-Reply**") 2 (ECF No. 65). Most recently, on June 1, 2021, Calvary Chapel filed a motion for an injunction pending disposition of its writ for certiorari, along with a request for an expedited ruling (ECF No. 68).[13]

---

[13]    Although this motion was filed on June 1, 2021, eight days after Executive Order 38 lifted all capacity restrictions on indoor gatherings and fifteen days after counsel for Calvary Chapel acknowledged that it was aware of this then-pending change, Calvary Chapel asserts—using the present tense and citing no executive order—that "Calvary Chapel is subject to a 50-person cap" and that "every single attendee is prohibited from attending worship because the 50-person cap precludes Calvary Chapel from offering religious worship services to anyone besides those enrolled" in its residential program. Pl.'s Mot. for Inj. Pending Disposition of Pet. for Writ of Cert. ("**Pl.'s Mot. Pending Disposition**") 3 (ECF No. 68). This is a false statement. Counsel for the Plaintiff are reminded of their duty of candor to the Court and the requirements of Rule 11(b)(3) of the Federal Rules of Civil Procedure.

## LEGAL STANDARD

Article III of the United States Constitution confines the jurisdiction of federal courts "to those claims that involve actual 'cases' or 'controversies.' " *Redfern v. Napolitano*, 727 F.3d 77, 83 (1st Cir. 2013) (quoting U.S. Const. art. III, § 2, cl. 1). This means that a federal court "lack[s] constitutional authority to decide moot questions." *Barr v. Galvin*, 626 F.3d 99, 104 (1st Cir. 2010). "A case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome," meaning "the court cannot give any effectual relief to the potentially prevailing party*." Bayley's Campground, Inc. v. Mills*, 985 F.3d 153, 157 (1st Cir. 2021) (internal citation, quotations, and alterations omitted). Moreover, "the fact that a live controversy existed when the plaintiff brought suit is not enough." *Redfern*, 727 F.3d at 83. Thus, dismissal is required where "events have transpired to render a court opinion merely advisory." *Am. C.L. Union of Mass. v. U.S. Conf. of Cath. Bishops* ("*ACLUM*"), 705 F.3d 44, 52–53 (1st Cir. 2013).

A claim for injunctive relief is moot if the court "cannot grant any 'effectual relief' by ordering the injunction" because "the parties no longer have a legally cognizable stake in the outcome." *In re Light Cigarettes Mktg. Sales Pracs. Litig.*, 271 F.R.D. 402, 422 (D. Me. 2010) (quoting *N.H. Motor Transp. Ass'n v. Rowe*, 448 F.3d 66, 73 (1st Cir. 2006)) (internal quotation marks omitted); *see also World Gym, Inc. v. Baker*, 474 F. Supp. 3d 426, 430 (D. Mass. 2020). Likewise, typically the "issuance of a declaratory judgment deeming past conduct illegal is also not permissible as it would be merely advisory." *ACLUM*, 705 F.3d at 53 (adding that "[t]he Supreme Court has admonished that federal courts 'are not in the business of pronouncing that

past actions which have no demonstrable continuing effect were right or wrong.' " (quoting *Spencer v. Kemna*, 523 U.S. 1, 18 (1998))).

A court ordinarily must determine if a case is moot before proceeding to the merits. *ACLUM*, 705 F.3d at 52. The "proper vehicle" for asserting mootness is Federal Rule of Civil Procedure 12(b)(1). *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 362–63 (1st Cir. 2001). An assertion of mootness typically raises a factual question—namely, whether the facts pleaded in the Complaint have changed and the plaintiff's claims have been resolved. *See Frye v. Gardner*, Case No. 20-cv-751-SM, 2020 WL 7246532, at *1–2 (D.N.H. Dec. 9, 2020). Thus, in weighing such a motion, a court must resolve any factual disputes between the parties, and it has "broad authority" to consider evidence beyond the pleadings. *Valentin*, 245 F.3d at 363–64. The party invoking mootness bears the burden of proving it. *ACLUM*, 705 F.3d at 52.

## ANALYSIS

The Governor moves to dismiss this case as moot given the changes that have occurred since the Plaintiff filed its Complaint. I first address the Governor's claim of mootness and then turn to the question of whether the Plaintiffs fall within any exception to the mootness doctrine. Finally, I consider whether there exist any other viable claims that would preclude dismissal.

## I.   Application of the Mootness Doctrine

As discussed above, the Complaint, which was filed on May 5, 2020, alleges that a group of executive orders and the State's reopening plan—together, the "GATHERING ORDERS"—violate Calvary Chapel's constitutional rights. *See*

18

Compl. ¶¶ 50, 86–169. At that time, the operative executive orders included a ten-person gathering limit, a stay-at-home order, occupancy limits for retail stores based on size, authorization for essential businesses to continue operations, and the promulgation of the Restarting Plan, which contemplated phasing out the distinction between essential and nonessential businesses and increasing gathering limits during the summer of 2020.

None of the restrictions imposed by the GATHERING ORDERS is in effect today.[14] Nor were they in effect on February 18, 2021, when Calvary Chapel filed its renewed motion for a preliminary injunction. At that time, houses of worship were permitted to hold gatherings of fifty people or five per 1,000 square feet, whichever was greater. *See* Executive Order 31. By the time Calvary Chapel's motion came under advisement, the indoor gathering limit for all types of gatherings and retail stores was the greatest of fifty people, five per 1,000 square feet, or fifty percent capacity.[15] *See* Executive Order 35. Today, there are no gathering restrictions in place. *See* Executive Order 38.

Calvary Chapel makes the unsupported assertion that the "Governor admits" that her Restarting Plan is still operational. Pl.'s Resp. in Opp'n to Def.'s Mot. to

---

[14]   Even if I were to read the Complaint as a challenge to the strict fifty-person limit that went into effect in June of 2020 or to any restriction that allegedly treated religious gatherings less favorably than certain businesses or secular gatherings, such a challenge would likewise be moot. Religious gatherings have not been subject to such treatment for nearly four months.

[15]   The Plaintiff did not acknowledge or address Executive Order 35 in its briefing. That order, which was issued on March 5 and went into effect on March 26, allowed Calvary Chapel—like all entities running indoor gatherings—to invite fifty *percent* of its occupancy limit if that number was greater than the existing limits.

Dismiss ("**Pl.'s Opp'n**") 4 (ECF No. 48). To support this point, the Plaintiff cites to two pages of the Defendant's motion. Pl.'s Opp'n 4 (citing Def.'s Mot. 4–5). But nowhere on those pages does the Defendant admit that the Restarting Plan is still controlling, and the Governor makes clear in her Reply Brief that she does not view the Restarting Plan as having the force of law. Def.'s Reply in Supp. of Her Mot. to Dismiss 1–2 (ECF No. 52) (stating that the Restarting Plan was "just . . . a plan" and does "not itself impose obligations" on Calvary Chapel). Regardless of whether the Restarting Plan has any force of law,[16] it is no longer in effect. According to the State's website,[17] "[t]he fourth and final stage of the Restarting Maine's Economy plan ended with the release of the Moving Maine Forward Plan on March 5, 2021."[18] *See* Restarting Maine's Economy, COVID-19 Response, Office of the Governor, *available at* https://www.maine.gov/covid19/restartingmaine (last visited June 4, 2021).

In an attempt to get around the fact that the Complaint takes aim at a specific and clearly defined set of orders that are no longer in effect, Calvary Chapel contends that its Complaint challenges all of the Governor's orders (then existing and since-

---

[16]    The fact that the Governor issued executive orders implementing the Restarting Plan, *see, e.g.*, Executive Order 55 (titled "An Order to Further Implement the Restarting Plan"), supports the argument that the Plan itself lacks the force of law.

[17]    *See supra,* n. 4.

[18]    For some reason, the Defendant did not mention the fact that the Restarting Plan had been replaced by a new plan. Although I take judicial notice of that fact, I also note that the record facts also support an inference that the Restarting Plan was phased out. Phase Four, the final phase contemplated by the Restarting Plan, was implemented through Executive Order 14 FY 20/21 on October 6, 2020. Since then, the Governor has issued numerous executive orders that do not mention the Restarting Plan and do not align precisely with what was envisioned in the Restarting Plan. *See, e.g.*, Executive Order 31 (specifically authorizing houses of worship to accommodate the greater of fifty people or five per 1,000 square feet, a change favorable to religious activity that is not mentioned in the Restarting Plan).

issued) as an unconstitutional "regime." This assertion, however, does not withstand scrutiny. The term "regime" is not used in the Complaint, and the Complaint clearly states that it refers to the GATHERING ORDERS—the focus of the challenge— collectively as "Executive Order 14, Executive Order 19, Executive Order 28, Executive Order 49, and the Restarting Maine's Economy plan." Compl. ¶ 50.

Calvary Chapel asserts that three specific paragraphs of the Complaint make clear that its challenge goes beyond the defined GATHERING ORDERS and includes "the entire regime under which the Governor purports to continue her unabated imposition over religious worship services." Pl.'s Opp'n 4. On close inspection, however, none of those paragraphs can fairly be read to be seeking a preliminary or permanent injunction of anything beyond the "GATHERING ORDERS" as defined in Paragraph 50 of the Complaint.[19] Calvary Chapel's "regime" argument thus lacks any support in its Complaint.

---

[19]    All three paragraphs are found in the Complaint's "Prayer for Relief" section. The first is found in the section seeking a Temporary Restraining Order, and we are long past the TRO point of this litigation. The second reference is to page 41, paragraph B.ii of the Complaint, which, according to Calvary Chapel, "request[s] injunctive relief against the Governor's Orders that fail to treat Calvary Chapel's religious gathering on an equal basis with so-called essential businesses and other nonreligious gatherings." Pl.'s Resp. in Opp'n to Def.'s Mot. to Dismiss ("**Pl.'s Opp'n**") 4 (ECF No. 48). But the actual paragraph seeks an injunction prohibiting Governor Mills and the State "from enforcing the GATHERING ORDERS so that: . . . ii. The State will apply the GATHERING ORDERS in a manner that treats Calvary Chapel's religious gatherings on equal terms as gatherings for or in so-called 'essential' businesses and non-religious entities."  Compl. at p. 41 ¶ B.ii. As to its third reference, Calvary Chapel suggests that the Complaint sought "injunctive relief against 'any future limitations or restrictions the State may impose in any future modification, revision, or amendment of the GATHERING ORDERS or similar legal directive,' " Pl.'s Opp'n 4 (citing Compl. at 42 ¶ B.iv), but this mischaracterizes the language of the Complaint. While this paragraph refers to orders outside the defined GATHERING ORDERS, it does not challenge those orders but only seeks "the opportunity to comport [Calvary Chapel's] behavior to them." Although it is not clear exactly what this language means, it is clearly not an attack on future orders outside the defined GATHERING ORDERS as the Plaintiff claims.

Calvary Chapel could have moved to amend its Complaint to challenge the Executive Orders that were in effect in February when it renewed its motion for injunctive relief. It's clear that the Governor would not have opposed such a motion. *See* Def.'s Opp'n 8. It did not, and a party cannot amend its Complaint by assertions made in briefs. *See Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Homeland Sec.*, 387 F. Supp. 3d 33, 54 (D.D.C. 2019), *amended*, Civil Action No. 18-2473 (RC), 2019 WL 11307644 (D.D.C. July 22, 2019) ("A plaintiff cannot amend its complaint by the briefs in opposition to a motion to dismiss." (quoting *Woytowicz v. George Washington Univ.*, 327 F. Supp. 3d 105, 121 (D.D.C. 2018))); *WeWork Companies Inc. v. WePlus (Shanghai) Tech. Co.*, Case No. 5:18-cv-04543-EJD, 2020 WL 83845, at \*4 (N.D. Cal. Jan. 7, 2020) ("Plaintiff cannot recast the complaint into a general grievance. . . ."). Even if I were to allow the Plaintiff to stretch its claims to encompass Executive Orders not included in the Complaint's definition of the GATHERING ORDERS, the Plaintiff's briefing does not cite a single Executive Order issued after May 5, 2020, that discriminated against religious gatherings and that was in effect when it filed its pending motion for a preliminary injunction or any time thereafter.[20]

---

[20]   In its briefing on the pending motions, Calvary Chapel contends, without citing a specific Executive Order, that recent gathering limits—which were in place only until May 24, 2021—were unconstitutional. *See* Pl.'s Opp'n 3–4. However, the most recent restrictions treated religious gatherings the same or better than non-religious gatherings and retail stores. Thus, it is unclear how they would fit into any discriminatory "regime" that Calvary Chapel attacks in its Complaint and various briefs and motions. *See* Compl. ¶¶ 2, 48, 57–63, 74; Pl.'s Opp'n 1, 3 (asserting that Maine imposes a "discriminatory 50-person cap on Calvary Chapel's religious worship services while exempting" other activities); Pl.'s Renewed Mot. for Prelim. Inj. ("**Pl.'s Mot.**") 1 (ECF No. 45) (seeking to "enjoin the Governor from enforcing her discriminatory COVID-19 restrictions on religious worship services while exempting myriad secular businesses and gatherings from similar restrictions").

The sum and substance of the Complaint's plea for injunctive relief is a request to enjoin the GATHERING ORDERS and to let Calvary Chapel hold gatherings in accordance with the rules applied to secular activities. The relief that Calvary Chapel seeks—being permitted to hold gatherings to the same extent as the previously labeled "essential" businesses—is already in place because there are no gathering limits. *See Town of Portsmouth v. Lewis*, 813 F.3d 54, 58–59 (1st Cir. 2016) (holding that any opinion issued by court would be "an advisory opinion on hypothetical conduct" because there was "no ongoing conduct to enjoin"); *ACLUM*, 705 F.3d at 53 (explaining that mootness arises when "a court cannot provide meaningful relief to the allegedly aggrieved party," with the "clearest" example being "cases where the only relief requested is an injunction").

Given the current lack of restrictions, a court order granting the relief sought in the Complaint would be meaningless. Because the restrictions challenged in the Complaint are no longer in force, the Plaintiff's claims for injunctive and declaratory relief are moot. *See D.H.L. Assocs., Inc. v. O'Gorman*, 199 F.3d 50, 54 (1st Cir. 1999) ("[W]e are without power to grant injunctive and declaratory relief because the [challenged] ordinances no longer exist."); *see also ACLUM*, 705 F.3d at 52–53.

## II.   Exceptions to the Mootness Doctrine

Despite the fact that the restrictions identified in the Complaint are no longer in effect, the Plaintiff argues that dismissal is not warranted because two exceptions to the mootness doctrine apply. I address each exception in turn.

23

### A.      Voluntary Cessation

As the Plaintiff notes, an exception to the mootness doctrine arises where the defendant voluntarily ceases the challenged practice. *See ACLUM*, 705 F.3d at 54. This "voluntary cessation" exception derives from "the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *Id.* (quoting *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001)). The concern is that "a manipulative litigant" will try to "immuniz[e] itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately after." *Id.* at 54–55.

To defeat this exception, the defendant must overcome "the formidable burden . . . of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."[21] *Bayley's Campground*, 985 F.3d at 157–58 (internal quotations omitted); *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). The likelihood that the challenged activity will be renewed is "highly sensitive to the facts of a given case." *ACLUM*, 705 F.3d at 56. Courts have held that the voluntary cessation doctrine is inapplicable— and thus a finding of mootness is permissible—when the cessation of the challenged

---

[21]      I rely on the standard articulated by the First Circuit in *Bayley's Campground* because it constitutes recent, binding precedent. But I note that each party cites to other decisions that contain iterations of the standard that support its own position. *See* Def.'s Reply in Supp. of Her Mot. to Dismiss 4–5 (ECF No. 52) (contending that "there must be 'a <u>reasonable</u> expectation that the challenged conduct will be repeated' for the voluntary cessation exception to apply" (emphasis added) (quoting *D.H.L. Assocs., Inc. v. O'Gorman*, 199 F.3d 50, 55 (1st Cir. 1999))); Pl.'s Opp'n 14 (arguing that "the Governor has 'neither asserted nor demonstrated that [she] will **never** resume' the complained of conduct" (emphasis added) (quoting *Norman-Bloodsaw v. Lawrence Berkeley Lab'y*, 135 F.3d 1260, 1274 (9th Cir. 1998))).

activity occurred "because of reasons unrelated to the litigation" or "because of an event that was scheduled before the initiation of the litigation, and is not brought about or hastened by any action of the defendant." *ACLUM*, 705 F.3d at 55.

Here, Governor Mills has voluntarily eased—and then eliminated—the restrictions on gatherings, including the restrictions on faith-based gatherings. But there is no indication that she did so due to this litigation or as a strategy for moving the goalposts to prevail in this case. Both the increase of the indoor gathering limit to fifty people and the phasing out of the distinction between essential and non-essential entities were contemplated before the Plaintiff even filed its Complaint. *Compare* Executive Order 49 (issued April 29, 2020), *and* Restarting Plan (issued April 28, 2020), *with Tandon v. Newsom*, 141 S. Ct. 1294 (2021) (per curiam) (holding that case was not moot because state officials "changed the challenged policy shortly after this application was filed").

Moreover, the Governor's actions have made it clear that she does not intend to reimpose the more restrictive limits on religious gatherings. Before any vaccine was available and as cases increased in the late fall and early winter, Governor Mills did not return to the ten-person limit. Nor did she return to the abandoned distinction between essential and non-essential entities. In fact, since May of 2020, Governor Mills has only issued one executive order that tightened restrictions on indoor gathering limits. *See* Executive Order 16. And that order did not reimpose the ten-person limit that the Plaintiff challenged in the Complaint, and it did not enact any policy that treated religious organizations less favorably than non-religious ones.

Even when Governor Mills was faced with worsening conditions, the "allegedly wrongful behavior . . . [did not] recur." *Bayley's Campground*, 985 F.3d at 157–58 (internal quotations omitted). And the Governor's actions in the most recent executive orders demonstrate that she has continued her trend of loosening restrictions, particularly for religious gatherings. *See* Executive Order 31 (permitting religious gatherings to accommodate fifty people or five per 1,000 square feet); Executive Order 35 (setting dates in March and May for further increases to the limits for all types of indoor gatherings); Executive Order 38 (eliminating capacity limits on indoor gatherings effective May 24, 2021).

The statements by the Governor's counsel further support this conclusion. Gerald D. Reid, the Governor's Chief Legal Counsel and principal advisor on the State's emergency response to the pandemic, states that "it is highly unlikely that the Governor will ever reimpose the 10-person limit on gatherings set forth in Executive Order 14 FY 19/20, at least with respect to religious gatherings." Reid Decl. ¶ 11. He notes that this position is based both on the likely unconstitutionality of a ten-person limit on religious gatherings, as suggested by the Supreme Court in *Roman Catholic Diocese of Brooklyn v. Cuomo*, and on the increased vaccination rates in the State, which mitigate risks associated with gatherings. Reid Decl. ¶¶ 11–12 (citing 141 S. Ct. 63 (2020)). At the time Mr. Reid submitted his declaration in early February 2021, he stated that the Governor was considering increasing the limits on religious gatherings, actions that she thereafter took. Reid Decl. ¶ 13.

Taken together, these facts clearly demonstrate that the restrictions challenged in the Complaint were rescinded for reasons unrelated to this litigation. *See Fitzgerald v. City of Portland*, No. 2:14-cv-00053-NT, 2014 WL 5473026, at *4 (D. Me. Oct. 27, 2014) ("[T]here is no reasonable expectation of recurrences of the challenged conduct . . . where the City Council swiftly repealed the Ordinance in response to newly decided Supreme Court precedent, and indicated a desire to enact a different, constitutionally-permissible policy in the future." (internal quotations and citation omitted)); *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 307 (3d Cir. 2020) ("[I]f the defendant ceases because of a new statute or a ruling in a completely different case, its argument for mootness is much stronger.").

These facts distinguish this case from those cited by the Plaintiff. *See Bayley's Campground*, 985 F.3d at 157–58 (stating that record suggests that Governor rescinded restriction based on changing virus conditions and noting that "the Governor has not denied that a spike in the spread of the virus in Maine could lead her to impose a [restriction] just as strict" as the one rescinded);[22] *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 345 (7th Cir. 2020) (finding challenge to a rescinded executive order not moot because reopening plan contemplated a return to stricter rules if specific conditions changed), *cert. denied sub nom. Elim*

---

[22]     As the Plaintiff points out, in *Bayley's Campground* the Governor stated that "it is certainly possible that if conditions change, the Governor may need to impose new restrictions. There is nothing to suggest, though, that such restrictions will be identical to the ones in the now-rescinded EO34." Pl.'s Opp'n 8 (quoting Br. of Def.-Appellee Governor Janet T. Mills, *Bayley's Campground, Inc., v. Mills*, 2020 WL 4347121, at *30-31 (1st Cir. July 24, 2020)). Here, the Governor by words and actions is essentially stating not only that there is no indication that *identical* restrictions will be imposed but also that there is no indication that *any* new restrictions will be imposed, especially ones that would discriminate against religious activities.

*Romanian Church v. Pritzker*, No. 20-569, 2021 WL 1163867 (U.S. Mar. 29, 2021); *Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228, 1230 n.1 (9th Cir. 2020) (recognizing that, although the current directive was no longer in force by the time appellate court reviewed it, the governor had issued subsequent executive orders that likewise treated religious gatherings less favorably than non-religious ones, and noting that the governor could "just as easily" restore the original restrictions); *Roman Catholic Archbishop of Washington v. Bowser*, Case No. 20-cv-03625 (TNM), 2021 WL 1146399, at *5 (D.D.C. Mar. 25, 2021) (holding that challenge to 250-person cap for religious services was not moot because city's grant of a waiver from that restriction was set to expire and limit would be reinstated).

The Plaintiff relies heavily on the Supreme Court's decisions in *Roman Catholic* and *Tandon v. Newsom* to support its argument on voluntary cessation.[23] But the facts of these cases are likewise distinguishable. In *Roman Catholic*, the governor of New York used a color-coded system to classify sections of the state based on the severity of the COVID-19 outbreak in that area and imposed correspondingly severe restrictions on activities within each zone. *See Roman Catholic*, 141 S. Ct. at 69 (Gorsuch, J., concurring). In the weeks leading up to the Supreme Court's consideration of the case, the governor had changed the classification of areas numerous times without notice. *Id.* at 68 & n.3 (per curiam). The Supreme Court held

---

[23]    Aside from containing distinguishable facts, *Roman Catholic* and the other recent Supreme Court cases cited by the Plaintiff arose in a different procedural posture. These cases all involved petitions for emergency relief and limited briefing before the Supreme Court, and some—like *Roman Catholic*—contain multiple fractured opinions signed only by a single Justice. Most importantly, there is no indication that these cases altered the well-established standards of the mootness doctrine and its exceptions, or overruled any prior opinion defining those standards.

that the case was not moot "because the applicants remain[ed] under a constant threat that the area in question [would] be reclassified," and if that occurred, "the reclassification [would] almost certainly bar individuals in the affected area from attending services before judicial relief [could] be obtained." *Id.* at 68. In his concurrence, Justice Gorsuch noted that the governor loosened the restrictions "just as this Court was preparing to act," while still "continuing to assert the power to tighten them again anytime as conditions warrant." *Id.* at 71–72 (Gorsuch, J., concurring). Justice Gorsuch added that the governor and mayor had indicated that all of New York City might soon be reclassified as a zone with tighter restrictions and that "it seem[ed] inevitable [that] this dispute [would] require the Court's attention." *Id.* at 72 (Gorsuch, J., concurring); *see also id.* at 74 (Kavanaugh, J., concurring) (noting that the state did not argue that the case was moot and thus did "not deny that the applicants face[d] an imminent injury"); *see also Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 n.16 (2d Cir. 2020) (rejecting mootness argument when reviewing same classification scheme).

In *Tandon v. Newsom*, which was decided after the pending motions came under advisement, the Supreme Court granted the plaintiffs' application for emergency injunctive relief pending appeal and enjoined California from enforcing restrictions that treated at-home religious exercise less favorably than some secular activities. 141 S. Ct. at 1297 (per curiam). Although California officials had "changed the challenged policy shortly after [the application for emergency injunctive relief] was filed, the previous restrictions remain[ed] in place" for a few more days, and the

Court noted that, "even if the government withdraws or modifies a COVID restriction in the course of litigation, that does not necessarily moot the case."[24] *Id.* at 1297. As in *Roman Catholic*, the Court in *Tandon* explained that, in cases that are not moot, "litigants otherwise entitled to emergency injunctive relief remain entitled to such relief where the applicants 'remain under a constant threat' that government officials will use their power to reinstate the challenged restrictions." *Id.*

Whether there remains a constant threat that government officials will reinstate the challenged restrictions is fact dependent. The facts here are distinguishable from those in *Roman Catholic* and *Tandon*. Governor Mills has not instituted a comparable color-coded system that calls for the reinstatement of stricter limits when cases rise, as was the case in New York. Even as case numbers shot up in Maine, the Governor's actions since May of 2020 have been almost entirely in one direction—easing restrictions on gatherings and indoor occupancy limits and treating religious gatherings the same as or better than non-religious gatherings.[25] Her actions and statements thus belie any conclusion that she will reinstate the ten-person limit for religious gatherings or return to the essential/nonessential distinction after this case is dismissed. *See ACLUM*, 705 F.3d at 54; *see also D.H.L.*

---

[24]     Calvary Chapel argues that *Tandon* "eviscerates any claim of mootness." Pl.'s Surreply in Supp. of Its Renewed Mot. for Prelim. Inj. ("**Pl.'s Sur-Reply**") 1 (ECF No. 65). But *Tandon* merely recognizes and reiterates the voluntary cessation exception to the mootness doctrine. Just as a case is not *necessarily* moot under the voluntary cessation exception, voluntary cessation does not *always* defeat a claim of mootness.

[25]     In the one instance where she tightened restrictions, she did not return to a ten-person indoor gathering limit and instead reinstated a fifty-person limit, which was still much more lenient than the restrictions challenged by the Plaintiff in its Complaint.

*Assocs.*, 199 F.3d at 55 (finding a return to the challenged conduct unlikely in part because the city's ordinance was amended "apparently for the purpose of making it more likely to overcome constitutional challenge" and had not been amended again in a few years).

*Tandon* is likewise distinguishable. The challenged restrictions in *Tandon* were scheduled to be rescinded but were still in place when the Court granted emergency relief, thus strongly improving the plaintiffs' claim that the case was not moot. Here, the ten-person gathering limit has not been in effect for over a year, and the differential treatment of religious institutions was stopped many months ago.

In both *Tandon* and *Roman Catholic*, there was a concern about "officials with a track record of 'moving the goalposts' " retaining "the authority to reinstate those heightened restrictions at any time." *Tandon*, 141 S. Ct. at 1297; *Roman Catholic*, 141 S. Ct. at 68 (noting that the Governor of New York "regularly changes the classification of particular areas without prior notice"). Here, as explained above, Governor Mills has not employed a strategy of "moving the goalposts." The fact that she retains some authority to reimpose restrictions does not mean that she is likely to do so, particularly given her counsel's statements and her actions thus far. I conclude that the Defendant has demonstrated that it is absolutely clear that Governor Mills cannot reasonably be expected to reinstate the GATHERING ORDERS that are identified in the Complaint.[26]

---

[26]    The Plaintiff asserts that the Governor has not made it "absolutely clear that she will not return to her old way," noting that Mr. Reid only states that it is "highly unlikely." *See* Pl.'s Opp'n 8, 13 (internal quotation omitted). However, the Plaintiff misstates the test. The question is not whether it is absolutely clear that the challenged conduct will not recur. Rather, the inquiry is whether it is

### B.   Capable of Repetition Yet Evading Review

The Plaintiff invokes a second exception to the mootness doctrine, one for conduct that is "capable of repetition, yet evading review." *ACLUM*, 705 F.3d at 56–57. This exception "applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Fed. Election Comm'n v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 462 (2007) (internal quotations omitted). It exists only in "exceptional situations," *Davidson v. Howe*, 749 F.3d 21, 26 (1st Cir. 2014) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)), and "is construed narrowly," *Redfern v. Napolitano*, 727 F.3d 77, 84 (1st Cir. 2013); *see also Alvarez v. Smith*, 558 U.S. 87, 93 (2009). The party invoking the exception "bears the burden and must show a 'reasonable expectation' or 'demonstrated probability,' . . . that it 'will again be subjected to the *alleged illegality*.' " *ACLUM*, 705 F.3d at 57 (quoting *Murphy v. Hunt*, 455 U.S. 478 (1982) (per curiam)); *Lyons*, 461 U.S. at 109).

The Plaintiff contends that this exception is applicable. It states that, "[g]iven the rapidly changing COVID-19 landscape, there is no question that the duration of the Governor's total prohibition on religious gatherings was always going to be 'too short to be fully litigated prior to cessation or expiration.' " Pl.'s Opp'n 18. But, even if the ten-person gathering limit was in place for too brief of a period of time to be

---

absolutely clear that the challenged conduct "could not reasonably be expected to occur." *Bayley's Campground*, 985 F.3d at 157–58; *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017). The facts here support such a conclusion.

fully litigated,[27] this exception would not apply. As discussed above, there is no "reasonable expectation" that Calvary Chapel will be subject to the "same" restrictions challenged in the Complaint.

## III.   Remaining Claims and Requests for Relief

In its reply to the renewed motion for a preliminary injunction, the Plaintiff first raises the argument that the case is not moot because its claim for nominal damages would preserve the suit. *See* Pl.'s Reply in Supp. of Renewed Mot. for Prelim. Inj. 3 (ECF No. 55) (citing *Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021)). Although this argument could be considered waived because the Plaintiff did not raise it in its opposition to the motion to dismiss, I requested that the Defendant file a sur-reply to address it (ECF No. 58). In that sur-reply, the Defendant emphasized that neither she nor Maine has waived Eleventh Amendment immunity, which bars plaintiffs from recovering damages—including nominal damages—from a state official sued in her official capacity. Def.'s Resp. to Pl.'s Reply in Supp. of Its Prelim. Inj. Mot. ("**Def.'s Sur-Reply**") 2–3 (ECF No. 59); *see also Arizonans for Off. English v. Arizona*, 520 U.S. 43, 69 n.24 (1997); *Sossamon v. Texas*, 563 U.S. 277, 288 (2011) (holding that RLUIPA does not include a waiver of state sovereign immunity); *Doe v.*

---

[27]   I am also not convinced that the Plaintiff has satisfied the first prong of this exception's test. The Plaintiff's challenge does not involve one of the "inherently transitory" claims recognized by the Supreme Court as likely to evade review. *See ACLUM*, 705 F.3d at 57 (identifying such issues as elections, pregnancies, and temporary restraining orders). The challenged executive orders are not inherently short or limited in duration. More fundamentally, there is nothing to suggest that the Court will be unable to promptly review challenges to the Governor's executive orders. I denied the Plaintiff's motion for a temporary restraining order four days after it was filed and one day after the Defendant filed its opposition. Further review by this Court did not occur until after the First Circuit's decision because both parties consented to a stay of this litigation. *See* Unopposed Mot. to Stay Further Proceedings Pending Appeal (ECF No. 35); Order Granting Mot. to Stay (ECF No. 36).

*Comm'r, N.H. Dep't of Health & Hum. Servs.*, Civil No. 18-cv-1039-JD, 2021 WL 27009, at *4 (D.N.H. Jan. 4, 2021) (dismissing claim for nominal damages against state official sued in her official capacity because such recovery is barred by the Eleventh Amendment (citing *ACLUM*, 705 F.3d at 53 n.7)), *appeal filed* No. 21-1058 (1st Cir. Jan. 27, 2021). Thus, the Governor adds, the Plaintiff's claims for nominal damages under both § 1983 and RLIUPA would be barred by such immunity. Def.'s Sur-Reply 2–3. For its part, Calvary Chapel appears to have subsequently abandoned its argument regarding nominal damages. *See* Pl.'s Sur-Reply (stating that Governor's argument about sovereign immunity is a "distraction" and that "[t]he ripeness of this case does not depend on nominal damages"). Given these facts, the Plaintiff cannot obtain nominal damages against the Defendant, and there is no other claim or relief available that would allow this case to remain viable.[28]

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Defendant's motion to dismiss (ECF No. 43). Because the injunctive relief sought in the Complaint is no longer available, the Plaintiff's renewed motion for a preliminary injunction (ECF No.

---

[28]    In Count VI, the Plaintiff alleges that the Governor violated the Guarantee Clause of the United States Constitution. *See* Compl. ¶¶ 149–161. But the Supreme Court has repeatedly held that the Guarantee Clause "does not provide the basis for a justiciable claim." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506 (2019). In Count IX, the Plaintiff alleges that the Governor has violated Article I, Section 13 of the Maine Constitution, which states that only the Legislature shall have the power to suspend laws. Compl. ¶¶ 202–07. Calvary Chapel has not developed any argument as to this claim and has not specified what declaratory or injunctive relief it is seeking through this claim.

Lastly, the Plaintiff seeks attorney's fees and costs, but such relief does not remedy mootness. *Trafford v. City of Westbrook*, 669 F. Supp. 2d 133, 141 (D. Me. 2009); *see also Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021).

45) and the Plaintiff's motion for an injunction pending disposition of its petition for writ of certiorari (ECF No. 68) are also **DENIED** as moot.


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 4th day of June, 2021.